David BRAKA, Ivor Braka, Murray Braka, Moises Braka, Isaac Braka, Percy N. Scherr, Lisa Bogart and Susan Bogart, Plaintiffs,

v.

BANCOMER, S.A., Defendant.

No. 83 Civ. 1727 (ADS).

United States District Court, S.D. New York.

June 20, 1984.

Lenefsky, Meier & Novod, New York City, for plaintiffs; David Braka, New York City, of counsel.

Curtis, Mallet-Prevost, Colt & Mosle, New York City, for defendant; Manuel R. Augulos, Edgar H. Garza-Morales, New York City, of counsel.

## OPINION AND ORDER

SOFAER, District Judge:

This action claiming breach of contract and charging violations of securities laws implicates the doctrines of foreign sovereign immunity and act of state. Defendant Bancomer, S.A. ("Bancomer") is a Mexican commercial bank nationalized by the Republic of Mexico in 1982. Plaintiffs are United States citizens who, beginning in 1981, purchased peso- and dollar-denominated certificates of deposit ("CDs") issued by Bancomer's Mexico City office. Plaintiffs bought the half-dozen dollar-denominated CDs that are the subject of this action during the Spring of 1982. The CDs were in amounts of $200,000, $300,000 and $400,000, with a total face value of $2,100,-000. The CDs were entitled in Spanish, "Certificado de Deposito a Plazo Dolares U.S. Cy" (Certificate of Time Deposit in U.S. Currency), and fixed Mexico City as the place of deposit and of payment of principal and interest. One of the CDs was scheduled to mature on September 9, 1982, and the remainder bore maturity dates in February 1983. The annual interest rates were fixed at 14.3 percent for the six-month deposits and at 23.25 percent and 20.49 percent for the one-year deposits.

According to the sworn affidavits of Bancomer officers, Hugo Mancilla and Hugo Escutia Gonzalez, plaintiffs were referred to the Mexico City bank by one of its United States clients and initiated the series of CD purchases by contacting the bank's Mexico City office. Plaintiffs or their agents arranged the details of each transaction by telephone with Bancomer's Mexico City personnel. Bancomer's New York agency, which was prohibited by New York banking law from accepting deposits, sometimes handled the interbank transfer of checks used to purchase the CDs; at other times sufficient funds were already on deposit in plaintiffs' Mexico accounts. Interest and principal were paid in Mexico, either by deposits to plaintiffs' Mexican bank accounts or by issuance of checks which plaintiffs sometimes collected in person and sometimes instructed Bancomer to

remit to them in New York via its correspondent banks. Interest and principal on the dollar-denominated CDs were both payable in United States dollars. Apparently, these transactions proceeded without incident until August 1982.

As summer approached, Mexico experienced a severe economic crunch. In the late 1970s Mexico had embarked on an ambitious domestic spending program financed by substantial overseas borrowing predicated on continuing high foreign currency revenues from the sale of its oil. By August 1982 the price of oil on the world market had fallen significantly, seriously eroding a primary source of the foreign exchange Mexico needed to repay its debts and placing the Mexican peso under severe pressure in foreign exchange markets.

On August 13, 1982, the Mexican Ministry of Treasury and Public Credit issued the first of a series of government decrees (Def.Ex. 1), designed to stabilize the nation's currency and stem the outflow of foreign exchange (*see* Def.Ex. 3 (translation) at 2). The August 13 decree mandated strict enforcement of a ban on the use of foreign currency as legal tender and required that all domestic obligations for payments in foreign currency, including dollar deposits to be paid within Mexico, be performed by delivering an equivalent amount in pesos at the prevailing exchange rate. The decree prohibited payment through transfers of dollar deposits to branches or correspondents abroad. On September 1, 1982, President Lopez Portillo signed two decrees, one nationalizing Mexico's private banks, including Bancomer, and the other establishing a general system of exchange controls. (Def.Ex. 2 & 3) On September 14 the Treasury Ministry promulgated "General Rules for Exchange Controls" setting official rates of exchange for repayment of dollar-denominated CDs and other outstanding "payment obligations that are to be performed within the Mexican Republic," and prohibiting further issuance of dollar-denominated CDs. (Def.Ex. 5 (translation) at 15–16) On December 12, 1982, the Treasury Ministry decreed that foreign currency obligations contracted prior to that date "shall be discharged by delivery of the equivalent amount of national currency at the special exchange rate determined by the *Banco de Mexico...,*" Mexico's central bank. (Def.Ex. 7 (translation) at 14) Plaintiffs tendered their certificates of deposit at the maturity dates and received in exchange Mexican pesos at the official exchange rate pursuant to the Mexican decrees described above.

As a result of Bancomer's compliance with these decrees, plaintiffs claim to have suffered damages of $994,800, representing the difference between the sum they received and what they would have received had their CDs been redeemed in dollars or exchanged at a free market rate. Plaintiffs assert both breach-of-contract and securities-law claims, charging Bancomer and its representatives with failure to register a security under 15 U.S.C. § 77e and with misrepresentation in connection with the sale of a security under 15 U.S.C. § 77q.

Bancomer has moved to dismiss these claims, advancing three primary defenses. First, it argues that this court lacks jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602–11, which authorizes jurisdiction of suits against foreign sovereigns, their agents or instrumentalities only if the matter falls within one of the enumerated exceptions to the doctrine of sovereign immunity. Second, Bancomer contends that, even assuming jurisdiction is proper, the act of state doctrine precludes adjudicating this challenge to the validity and effect of a foreign state's internal exchange controls imposed by governmental decree. Third, it contends that CDs are not "securities" within the meaning of the securities laws.

 Ordinarily the burden of proving jurisdictional facts rests on the party invoking jurisdiction, and it must respond to challenges to its pleadings. *See McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). The FSIA, however, places the burden on the defendant of establishing that it is entitled to sovereign immunity. *See Report of*

*House Judiciary Committee* No. 94–1487, reprinted in 1976 U.S.Code Cong. & Admin. News 6604, 6616; *Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371, 1378 (5th Cir.1980); *de Sanchez v. Banco Central de Nicaragua*, 515 F.Supp. 900, 903 (E.D.La.1981). Defendants have submitted affidavits and exhibits that in some respects contradict the factual allegations in plaintiffs' pleadings. A resolution of these factual disputes is essential to determining whether the court has subject matter jurisdiction under the FSIA.

■ A court considering a motion to dismiss is usually confined to the facts in the pleadings. But "[o]n a motion attacking the court's jurisdiction, the district judge may resolve disputed jurisdictional fact issues," 10 Wright, Miller & Kane, *Federal Practice and Procedure* § 2713 at 612, basing its conclusions on affidavits as well as the pleadings, *see Williams v. Minnesota Mining and Manufacturing Co.*, 14 F.R.D. 1, 9 (S.D.Cal.1953). Here defendant's motion raises not only jurisdictional issues of sovereign immunity but also issues of justiciability under the act of state doctrine. Presumably, the court's fact-finding powers as to the jurisdiction motion under 12(b)(1) extend also to the same facts in connection with the act of state determination. In any event, Rule 12(b) provides that, when matters outside the pleadings are presented on a 12(b)(6) motion to dismiss for failure to state a claim, the court may treat the motion as one for summary judgment under Rule 56. Plaintiffs have had ample opportunity to present any material pertinent to defendant's motions but have failed to offer anything beyond the conclusory statements in their pleadings and memorandum and the hearsay affidavit of an attorney. (Affid. of Lewis Novod) To the extent plaintiffs' unsupported allegations conflict with the sworn affidavits offered by the Bancomer officers who had direct responsibility for the transaction, they may be disregarded as they fail to raise material issues of fact. *See* Fed.R. Civ.P. 56(e) (motion for summary judgment may not be defeated by mere allegations); *Schwimmer v. Sony Corp. of America*, 637 F.2d 41, 44–45 & n. 9 (2d Cir.1980)

(unsupported attorney's hearsay affidavit is a nullity); *de Sanchez*, 515 F.Supp. at 907 (E.D.La.1981) (court considering FSIA § 1605(a)(2) claim may ignore conclusory allegations of fact). The record is therefore sufficient to permit conclusions of law on the sovereign immunity and act of state issues, whether the motion is decided under Rule 12(b) or Rule 56. *See de Sanchez*, 515 F.Supp. at 907. Given the facts outlined above, as gleaned from plaintiffs' pleadings and memorandum and Bancomer's detailed affidavits, Bancomer is not immune from suit, but the act of state doctrine precludes adjudicating plaintiffs' claims.

### I. *Immunity from Suit.*

■ The doctrine of sovereign immunity recognizes the mutual respect and independence that exists between coequal sovereigns. *See The Schooner Exchange v. M'Faddon*, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812). *See also First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 765, 92 S.Ct. 1808, 1812, 32 L.Ed.2d 466 (1972) (sovereign immunity stems from comity among nations). The United States follows the "restrictive" theory of sovereign immunity and waives jurisdiction only over a foreign sovereign's governmental as opposed to its commercial acts. *See Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). The Foreign Sovereign Immunities Act determines under what circumstances an agency or instrumentality of a foreign sovereign is subject to suit in United States courts. The primary purpose of the FSIA, enacted in 1976, "is to 'restrict' the immunity of a foreign state to suits involving a foreign state's public acts." *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 308 (2d Cir.1981) (Kaufman, J.), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). Bancomer was a state instrumentality as defined by the FSIA at the time of this lawsuit as well as at the time the act on which this suit is based took place. *See* 28 U.S.C. § 1603(b); *Frankel v. Banco Nacional de Mexico, S.A.*, 82–6457, slip op. at 7, n. 3 (S.D.N.Y.

May 31, 1983); *Callejo v. Bancomer, S.A.,* 3–82–1604–05–D, slip op. at 3 (N.D.Tex. February 27, 1984).

Only one of the FSIA's exceptions to immunity appears relevant to plaintiffs' claims: section 1605(a)(2), the provision authorizing jurisdiction

> in any case ... in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

Whether an activity is commercial is determined with reference to its nature rather than its purpose. *See* 28 U.S.C. § 1603(d). The legislative history suggests that courts should "inquire whether the activity in question is one which private parties ordinarily perform or whether it is peculiarly within the realm of governments." *Jurisdiction of U.S. Courts in Suits Against Foreign States: Hearings on H.R. 11315 Before Subcomm. on Administrative Law and Governmental Relations of the House Comm. on the Judiciary,* 94th Cong., 2d Sess. at 53 (1976) (statement of Monroe Leigh, Legal Advisor, U.S. Dep't of State); *accord Texas Milling,* 647 F.2d at 309 (if activity is one in which private person could engage, it is not entitled to immunity).

■ The first step in evaluating a claim under the FSIA, before attempting to characterize that act or activity as governmental or commercial, is to define with precision the activity, and the act in connection with that activity, that gave rise to plaintiff's claim. *See Texas Milling,* 647 F.2d at 308; *Arango,* 621 F.2d at 1379; Note, *Foreign Sovereign Immunity and Commercial Activity: A Conflicts Approach,* 83 Colum.L.Rev. 1440, 1488 (1983). Here, the activity at issue is Bancomer's issuance of CDs to attract time deposits. The act that gave rise to plaintiffs' claim was Bancomer's breach of its contractual obligation to

repay the deposits and any interest due in United States dollars.

■ Defendant has cited two unpublished opinions that dismissed claims against Mexican banks that failed to repay dollar-denominated deposits pursuant to the same 1982 decrees. Both courts concluded that the banks were immune from suit. *See Frankel,* 82–6457, slip op. at 5; *Callejo,* 3–82–1604–D, slip op. at 3. The court in *Frankel* ruled that the offering of CDs to attract time deposits was essentially commercial as opposed to "peculiarly governmental" activity. It defined the act complained of in connection with the activity, however, as the "promulgation of the currency control rules and regulations by the Mexican government" and characterized it as fundamentally governmental. *Frankel,* 82–6457, slip op. at 5; *Callejo,* 3–82–1604–D, slip op. at 5–6 (quoting *Frankel* ). Although a foreign sovereign's internal currency regulation "is precisely the type of governmental activity that cannot be subjected to judicial scrutiny," *Frankel,* 82–6457, slip op. at 5, the Ministry of Treasury, not Bancomer, was responsible for the exchange controls. The issue under the FSIA is to determine whether the act of the named defendant was performed in a sovereign or a commercial capacity; analysis must focus on the named defendant's acts which are the basis of the action and not on the separate acts of other sovereign instrumentalities or agencies.

In the case of a state-owned commercial enterprise, the line between governmental acts and nongovernmental acts in connection with a commercial activity in compliance with governmental decrees may be difficult to draw. *Compare, e.g., Allied Bank International v. Banco Credito Agricola,* 566 F.Supp. 1440, 1443 (S.D.N.Y. 1983), *aff'd,* 733 F.2d 23 (2d Cir.1984) (bank's failure to execute promissory note was commercial act, and bank was not eligible for immunity merely because it was prevented from paying by exchange control regulations) *with de Sanchez,* 515 F.Supp. at 907 (central bank whose function was to effectuate monetary controls and ex-

changes was immune from suit under § 1605(a)(2) based on its issuance of dollar-denominated checks in its capacity as central exchange bank but subject to suit for tort of ordering stop payment by a commercial correspondent in the United States after check was issued). *See also Arango,* 621 F.2d at 1379–80 (state-owned airline's personnel who forcibly placed deported alien on outgoing flight were acting as agents of immigration authorities and were immune from suit, but airline might still be liable on tort or contract theory that it breached its duty as a common carrier by failing to warn passengers of immigration list excluding certain aliens). Bancomer's case is fairly straightforward, however, since it was not the central bank and it had no special role in effectuating the monetary controls beyond complying with the decrees. Bancomer's act in paying pesos instead of dollars was not "peculiarly within the realm of government," Hearings, *supra,* and its breach was no more a sovereign act than that of any other debtor, private or public, that had contracted to repay an obligation in dollars rather than pesos. That it was prevented from complying with its contract by a governmental decree flatly prohibiting the use of dollars as legal tender does not make it immune from suit as an agent of the Republic of Mexico. *See De Letelier v. Republic of Chile,* 567 F.Supp. 1490, 1501 (S.D.N.Y. 1983) (fact that act was performed at behest of government does not make it noncommercial).

## II. *Act of State.*

■ That defendant is not immune from suit does not mean, however, that a United States court should proceed to adjudicate plaintiffs' claims. Judge Griesa of this District remarked in a case raising similar issues and involving a state-owned bank's failure to honor certain commercial notes:

> Even though the execution of the notes was a commercial activity, and "the action is based" upon these notes within the meaning of the [FSIA], a different question arises by virtue of the fact that the payment of the notes *was prevented* by certain directives of the Central Bank of Costa Rica, and of the President and Ministry of Finance of that country. This question is whether the governmental acts preventing payment of the notes fall within the act of state doctrine.

*Allied Bank,* 566 F.Supp. at 1443 (emphasis in original). The Supreme Court in *Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897), formulated the classic statement of the act of state doctrine:

> Every sovereign state is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another *done within its own territory.* Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

*Id.* (emphasis added). *See also Alfred Dunhill of London, Inc. v. Cuba,* 425 U.S. 682, 691 & n. 7, 96 S.Ct. 1854, 1859 & n. 7, 48 L.Ed.2d 301 (1976) (plurality opinion citing *Underhill*); *Banco National de Cuba v. Sabbatino,* 376 U.S. 398, 428, 84 S.Ct. 923, 940, 11 L.Ed.2d 804 (1964). Although the doctrines of foreign sovereign immunity and act of state address the same considerations of comity and separation of powers, *see First National City Bank,* 406 U.S. at 765, 92 S.Ct. at 1812, they come into play in different situations and serve somewhat different functions. While the effect of sovereign immunity is to shield the person of the foreign sovereign and, by extension, his agents from jurisdiction, the act of state doctrine shields the foreign sovereign's internal laws from intrusive scrutiny.

Professor Henkin suggests that act of state may be viewed as a "special rule modifying ordinary rules of conflict of laws. . . . If under accepted choice of law principles the foreign law would govern, the court could still refuse to apply that law if it were found to be contrary to the public policy of the forum. The act of state doctrine, however, says that the foreign law (i.e., the act of state) must govern certain transactions and that no public poli-

cy of the forum may stand in the way ...." Henkin, *Act of State Today: Recollections in Tranquility,* 6 Colum.J.Transnat'l L. 175, 178–80 (1967); *see also* L. Henkin, *Foreign Affairs and the Constitution* 223–24 (1972). "The major underpinning of the act of state doctrine is the policy of foreclosing court adjudications involving the legality of acts of foreign states on their own soil that might embarass the Executive Branch of our Government in the conduct of our foreign relations." *Alfred Dunhill,* 425 U.S. at 697, 96 S.Ct. at 1862 (opinion of White, J.) (citing *Sabbatino,* 376 U.S. at 427–28, 431–33, 84 S.Ct. at 939–40, 941–42).

The Second Circuit recently construed the act of state doctrine in considering whether it precluded adjudicating Chase Manhattan's liability to the holder of a CD issued by its Havana branch for the loss of deposits seized by the Cuban government. It stated:

> Under the act of state doctrine United States courts will not question the validity of the actions of foreign governments carried out within their borders.... Thus, the Cuban government could validly seize the debt owed to Garcia if the situs of the debt were in Cuba....
>
> [W]here a foreign government has both the parties and the res before it and alters their relationship thereto, our courts realize that there is little that they can do to change the legal relationship.

*Garcia v. The Chase Manhattan Bank, N.A.,* 735 F.2d 645, 649, 650 (2d Cir.1984). *Accord Allied Bank,* 733 F.2d at 25–26, *aff'g* 566 F.Supp. 1440 (under act of state doctrine which precludes examination of foreign state's confiscation of property within its own territory, if situs of obligation is Costa Rica then district court properly dismissed) (dictum). In *Garcia,* the Second Circuit concluded that the act of state doctrine did not apply. The plaintiff there was a Cuban citizen who had been promised that her deposits with Chase Manhattan's Havana branch would be safe from confiscation, because the CDs issued her could be redeemed at any Chase branch world-wide. "The purpose of the agreement ... was to ensure that Castro would

not be able to seize the debt." *Id.* at 650. The court held that, as the agreement was premised on the theory that Cuba was *not* the situs of the bank's debt, Cuba's act of state was ineffective to extinguish Chase's debt. *Id.* at 650. "Chase 'accepted the risk that it would be liable elsewhere for the obligations incurred by its branch.'" *Id.* (quoting *Vishipco Lines v. Chase Manhattan Bank, N.A.,* 660 F.2d 854, 863 (2d Cir.1981), *cert. denied,* 459 U.S. 976, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982)).

■ Plaintiffs here are United States investors who contracted to place deposits in a bank in Mexico. The CDs named Mexico City as the situs of the deposit. Interest and principal, while sometimes remitted at plaintiffs' instructions via interbank transfers, were nonetheless payable in Mexico City. Although it is unclear what motivated these New York plaintiffs to deposit dollar funds in a foreign bank situated abroad, the foreign dollar deposits here paid a relatively high rate of interest, apparently reflecting a "risk premium" needed to induce investors to deposit their U.S. dollars in countries that might impose controls on the exchange or export of foreign currency.

Moreover, in contrast to the situation in *Garcia,* Bancomer did not surrender its depositors' funds to a third party but rather complied with a law mandating that the bank's debts "shall be discharged" by payment of pesos at the official rate. When plaintiffs presented their CDs in exchange for pesos, the debt was extinguished for purposes of Mexican law. *Compare Garcia,* 735 F.2d at 650 (bank surrendered plaintiff's funds to the Cuban government without requiring presentation of the CDs). The parties' actions as well as the certificates themselves point to Mexico as the situs of the obligation, and thus the act of state doctrine prevents a challenge to that state's resolution of the parties' rights. *See Allied Bank,* 733 F.2d at 26; *Frankel,* 82–6457, slip op. at 7, n. 4.

■ Plaintiffs argue that their case triggers an "exception" to the act of state doctrine. They contend that Mexico's act was a repudiation of a commercial debt and

thus does not qualify as an act of state under the theory advanced by Justice White in Part III of his opinion in *Dunhill*, 425 U.S. at 698, 96 S.Ct. at 1863. In *Dunhill*, a Cuban state-owned cigar manufacturing concern refused to pay debts incurred in the normal course of business subsequent to Cuba's nationalization of the island's cigar industry. The defendants characterized this as an act of state but failed to cite any rule, regulation, or decree. The majority of the Court held that the evidence did not establish that Cuba had by any act of state repudiated the debt. *Id.* at 694–95, 96 S.Ct. at 1861. Part III of Justice White's opinion, joined by three other justices, proposed a commercial exception to the act of state doctrine on the ground that simple repudiation of a commercial debt, even if couched in the form of a state decree, needs and deserves no diplomatic protection or judicial deference. *Id.* at 695–706, 96 S.Ct. at 1861–1867. Plaintiffs here cannot rely on this rationale, because Mexico's act in this instance cannot be construed as a simple repudiation of a government entity's commercial debt. While the ultimate result may seem similar —i.e. Mexico has enriched itself at plaintiffs' expense—the mechanisms used by Mexico are conventional devices of civilized nations faced with severe monetary crises, rather than the crude and total confiscation by force of a private person's assets.

Appealing the lower court decision in *Allied Bank*, the injured banks raised a similar argument, contending that the government of Costa Rica was acting as a commercial entity in instituting controls on repayment of its foreign debt. The Second Circuit held that "[a]lthough the actions of Costa Rica affected commercial activity, Costa Rica was clearly acting as a sovereign in preventing a national fiscal disaster." *Allied Bank*, 733 F.2d at 27, 83–7714. The per curiam decision cited with approval a holding by the Ninth Circuit that "the act of state doctrine remains available ... regardless of any commercial component of the activity involved." *Id.* (quoting *International Association of Machinists and Aerospace Workers v. Organization of Petroleum Exporting Countries*, 649 F.2d 1354, 1360 (9th Cir. 1981), *cert. denied*, 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982)). *But see* Note, 83 Colum.L.Rev. at 1445–50 (arguing that a finding of commerciality under the FSIA should preclude application of the act of state doctrine). Like Costa Rica's limits on foreign exchange, Mexico's exchange controls were promulgated by formal executive and legislative decrees, *compare Dunhill*, 425 U.S. at 695, 96 S.Ct. at 1861, in the exercise of the recognized governmental function of setting monetary policy. Mexico acted in response to a fiscal crisis and its mandate touched all foreign currency obligations, private as well as public.

Plaintiffs next invoke the Hickenlooper Amendment, 22 U.S.C. § 2370(e)(2), which mandates that:

Notwithstanding any other provision of law, no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is asserted by any party including a foreign state ... based upon (or traced through) a confiscation or other taking ... by an act of that state in violation of the principles of international law. . . .

Former Chief Judge Fuld, writing for the New York State Court of Appeals, convincingly refuted a similar claim that the Hickenlooper Amendment applied to losses incurred as a result of a state's act in regulating currency:

A currency regulation which alters either the value or character of the money to be paid in satisfaction of contracts is not a "confiscation" or "taking." ... "A legislator who reduces rates of interest or renders agreements invalid or incapable of being performed or prohibits exports, or renders performance more expensive by the imposition of taxes or tariffs does not take property. Nor does he take property if he depreciates currency or prohibits payment in foreign currency or abrogates gold clauses. Expectations relating to the continuing intrinsic value of all currency or contractual terms such as

the gold clause are, like favorable business conditions and good will, 'transient circumstances, subject to changes', and suffer from 'congenital infirmity' that they may be changed by the competent legislator. They are not property, their change is not deprivation.

*French v. Banco Nacional de Cuba,* 23 N.Y.2d 46, 55–56, 295 N.Y.S.2d 433, 442–43, 242 N.E.2d 704 (1968) (citations omitted) (citing federal law and also quoting Mann, *Money in Public International Law,* 96 Recueil Des Cours [1959] 1, 90). Moreover, as defendants point out, the legality of such foreign exchange controls is widely accepted by authorities on international law. The Restatement Second of Foreign Relations Law of the United States, § 198 (1965), approves such measures when "reasonably necessary" to preserve a nation's exchange resources, and Comment b states that "the application to an alien of a requirement that foreign funds held within the territory of the state be surrendered against payment in local currency at the official rate of exchange is not wrongful under international law, even though the local currency is less valuable on the free market than the foreign funds surrendered." Defendants have placed before the court a letter signed by the Director of the Legal Department of the International Monetary Fund stating that the currency control measures enacted by Mexico "do not violate and are not inconsistent with the Articles of Agreement of the International Monetary Fund." (Def.Memo of Law of Aug. 9, 1983, Ex. 1)

Defendants contend that the Articles of Agreement of the International Monetary Fund ("IMF Bretton Woods Agreement"), 60 Stat. 1411, T.I.A.S. 1501 (Dec. 27, 1945), to which both the United States and Mexico are signatories, may constitute an independent ground under national as well as international law for holding plaintiffs' contract for repayment in dollars unenforceable in United States courts. The IMF Articles provide that "[e]xchange contracts which involve the currency of any member and which are contrary to the exchange control regulations of that member maintained or imposed consistently with this Agreement shall be unenforceable in the territories of any member." *Id.* at Art. VIII, § (b). This provision was incorporated into domestic law by 22 U.S.C. § 286h. Contracts analagous to the CDs at issue here have been recognized as falling within its scope. *See Banco do Brasil, S.A. v. A.C. Israel Commodity Co.,* 12 N.Y.2d 371, 375, 239 N.Y.S.2d 872, 874, 190 N.E.2d 235 (1963); *Weston Banking Corp. v. Turkiye Garanti Bankasi, A.S.,* 57 N.Y.2d 315, 326, 456 N.Y.S.2d 684, 689, 442 N.E.2d 1195 (1982) (dictum); *Confederation Life Association v. Ugalde,* 164 So.2d 1, 2, *cert. denied,* 379 U.S. 915, 85 S.Ct. 263, 13 L.Ed.2d 186 (1964) (insurance policy payable in dollars is an "exchange contract" under the IMF provision). *Accord* F.A. Mann, *The Legal Aspect of Money* 384–91 (1982); J. Gold, *The Fund Agreement in the Courts: Volume II* 216–18 (1982). *But see J. Zeevi and Sons, Ltd. v. Grindlays Bank (Uganda) Limited,* 37 N.Y.2d 220, 228–29, 371 N.Y.S.2d 892, 900, 333 N.E.2d 168, *cert. denied,* 423 U.S. 866, 96 S.Ct. 126, 46 L.Ed.2d 95 (1975) (irrevocable letter of credit payable in dollars in New York and drawn upon funds deposited in New York belonging to Ugandan bank is not an "exchange contract" under the IMF provision and court does not transgress IMF Treaty by refusing to uphold repudiation by the Ugandan bank). Defendants cite in addition New York Banking Law section 204-a, establishing that a foreign bank holding deposits payable in a foreign country has no greater liability in New York than it would under the laws of that country. N.Y. Banking Law 204-a (McKinney's 1971). Although act of state principles do not depend on a finding of legality under domestic law and in fact forestall consideration of the merits, defendant's arguments lend support to the conclusion that plaintiffs accepted the risks attending their foreign investments.

Finally, plaintiffs argue that, as their quarrel is not with Mexico but with Bancomer, adjudication of their claims would not call into question the "validity of the actions" of a foreign state. *Garcia,* 735 F.2d at 650. As defendants point out, "[a]ny recovery on any cause of action in

this case would be the equivalent of compelling Bancomer to comply with the initial terms of the certificate of deposit, by paying dollars or by paying pesos at a rate different from the government mandated exchange rate, in contravention of Mexican law." (Def.Reply Memo at 12) Judgment in favor of the plaintiffs by this court would effectively countermand Mexico's decree that foreign currency obligations payable in Mexico would be satisfied by compliance with the mandated rules.

In view of the holding that plaintiffs' claims are nonjusticiable as drawing into question a foreign sovereign's act of state within its own territory, no need exists to determine whether the CDs were "securities" within the meaning of federal securities laws or to decide whether the defendant's contacts with the United States in relation to the CD transaction were sufficient to permit personal jurisdiction under the long-arm provision incorporated in section 1605(a)(2) of the FSIA. Plaintiffs' action is hereby dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted, and alternatively under Rule 56 in that no genuine disputes of material fact exist as to the dispositive issues.

SO ORDERED.