WELTOVER, INC., Springdale Enterprises, Inc. and Bank Cantrade, A.G., Plaintiffs,

v.

REPUBLIC OF ARGENTINA and Banco Central De La Republica Argentina, Defendants.

No. 89 Civ. 6926 (JES).

United States District Court, S.D. New York.

Jan. 3, 1991.

Richard W. Cutler, New York City (Richard W. Cutler, of counsel), for plaintiffs.

Weil, Gotshal & Manges, New York City (Richard J. Davis, Bonnie Garone, Allison Corey Miller, of counsel), for defendants.

## OPINION AND ORDER

SPRIZZO, District Judge:

Plaintiffs Weltover, Inc. ("Weltover"), Springdale Enterprises, Inc. ("Springdale"), and Bank Cantrade, A.G. ("Bank Cantrade"), bring this action against the Republic of Argentina ("Argentina") and Banco Central De La Republica Argentina ("Banco Central") alleging that the defendants have breached obligations arising out of the issuance of certain bonds. The defendants move to dismiss the action for lack of subject matter jurisdiction and lack of personal jurisdiction or, in the alternative, pursuant to the doctrine of *forum non conveniens*. For the reasons that follow, the motions are denied.

## BACKGROUND

Plaintiffs Weltover, Springdale and Bank Cantrade are all holders in due course of various indentures denoted as "Registered Bonds Denominated in United States Dollars," which are referred to in the parties'

papers as "Bonods". *See* Complaint ¶¶ 10–15, 22–23, 29–30.[1] These indentures were issued by Banco Central, which is the financial agent for the Republic of Argentina, pursuant to Argentina's Foreign Exchange Insurance Contract ("FEIC") program. *See* Complaint at ¶¶ 5, 11; Affidavit of Daniel Marx at ¶¶ 3, 9 (sworn to April 11, 1990) ("Marx Aff.").[2]

That program, instituted in 1982, sought to deal with the devaluation of Argentinian currency on the world market by allowing an Argentinian borrower required to pay a debt in dollars to pay a specified amount of the local currency to Banco Central and receive in exchange the amount of U.S. dollars necessary to repay the loan. *See* Marx Aff. at ¶¶ 7–8. However, when the exchange insurance contracts matured in late 1982, Banco Central was unable to deliver the dollars necessary to retire the Argentine debtors' original loans. *See* Marx Aff. at ¶ 9. Accordingly, Banco Central issued two new types of instruments to refinance those debts: Bonods and promissory notes. *See id.*

The Bonods provided in relevant part that payment would be made in United States dollars on scheduled dates in 1986 and 1987 and would bear interest at the annual prevailing London Interbank market rate for 180–day Eurodollar deposits. Furthermore, they would be paid into a holder's account at either New York, London, Frankfurt or Zurich. *See* Complaint ¶ 16; Marx Aff. ¶¶ 10–11 & Exs. B–C.

Significantly, foreign creditors were given the option of maintaining their relationship with the original Argentine debtors,

---

1. Weltover, a Panamanian corporation, holds title by assignment to Bonods totalling $900,000. *See* Complaint ¶ 14. Springdale, also a Panamanian corporation, holds title by assignment to Bonods totalling $200,000. *See id.* at ¶ 22. Bank Cantrade, a Swiss Bank, holds title to Bonods totalling $230,000. *See id.* at ¶ 29.

2. The Court has considered the Marx Affidavit and the exhibits annexed thereto in determining whether subject matter jurisdiction is appropriate under the Foreign Sovereign Immunities Act. This is consistent with the Second Circuit's holdings that a court may properly rely upon affidavits and other evidence in resolving a mo-

tion challenging subject matter jurisdiction. *See, e.g., Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir.1986); *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126, 1130–31 (2d Cir.1976); *see also L'Europeenne de Banque v. La Republica de Venezuela,* 700 F.Supp. 114, 119 n. 6 (S.D.N.Y.1988) (citing *Braka v. Bancomer, S.A.,* 589 F.Supp. 1465, 1468 (S.D.N.Y.1984), *aff'd,* 762 F.2d 222 (2d Cir. 1985)). Plaintiffs have not contested any of the facts relied upon herein and, indeed, have cited the Marx Affidavit and pertinent exhibits in support of their arguments.

with the Bonods given in guarantee, or to accept the Bonods or promissory notes as payment of the original debt.[3]  *See* Marx Aff. at ¶ 10.  However, under Argentina's foreign exchange laws only Banco Central could have paid the creditors in American dollars.  Moreover, Banco Central collected a commission of one-tenth percent (0.1%) in connection with the aforesaid transactions.  *See* Marx Aff., Ex. B, Decree No. 1334, at Art. 6;  *see also* Affidavit of Richard W. Cutler, Esq. ¶ 3 (sworn to May 29, 1990) ("Cutler Aff.").

However, financial difficulties in Argentina continued, with the consequence that on or about May 23, 1986 defendants, acting pursuant to a governmental decree and an order from the Ministry of the Economy, notified plaintiffs that payment would not be made on the Bonods when due and requested that they participate in a "rollover" of those obligations.  *See* Complaint at ¶¶ 17, 24, 31;  Marx Aff. at ¶¶ 12–14.  Plaintiffs refused to participate in that rollover and now assert that Banco Central is in default on its obligations under the Bonods.  *See* Complaint at ¶¶ 18–20, 25–27, 32–34.

## DISCUSSION

Defendants urge three grounds for dismissal of the complaint: (1) that the Court lacks jurisdiction over the defendants under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–1611 (1988) ("FSIA"); (2) that the exercise of personal jurisdiction over the defendants violates due process;

and (3) that the Court should dismiss the complaint under the doctrine of *forum non conveniens.*

### The Foreign Sovereign Immunities Act

■ The FSIA provides that foreign sovereigns and their instrumentalities are immune from suit in United States courts unless the conduct complained of fits within various specified exceptions.  *See Letelier v. Republic of Chile,* 748 F.2d 790, 793 (2d Cir.1984), *cert. denied,* 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985); *see also Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989) (holding that the FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court).  Plaintiffs argue that Argentina and Banco Central are subject to jurisdiction under the FSIA because the complaint is based upon their commercial activities, *see* 28 U.S.C. § 1605(a)(2), and because they have waived sovereign immunity.[4]  *See* 28 U.S.C. § 1605(a)(1).

■ The commercial activity exception to sovereign immunity provides that a foreign state does not enjoy immunity in a case where

the action is based upon a commercial activity carried on in the United States by a foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in con-

---

**3.** Banco Central's Communication "A" 251, dated November 17, 1982, which sets forth in detail the method by which Bonods and promissory notes would be available to refinance the debts, provides in part:
> 1.2.  The instrumentation of the transactions shall be optional for the foreign creditor and may be done in any of the following forms:
> (a) Obligations ("Promissory Notes") of the National Government issued in U.S. dollars to the name of the creditor, for the corresponding amounts.
> (b) Registered Bonds of the National Government, issued in U.S. dollars in increments of U.S. $5,000 and larger denominations.
> (c) Since it is not the purpose of these measures to interfere in the loan contract between the debtor and creditor, if they prefer to maintain their relationship directly and in-

strument it in any form other than the two forms indicated above, the Central Bank is willing to examine such proposals and conditions, provided that they respect the terms of maturity indicated in Section 1.1.

Banco Central Communication "A" 251 at 2 (annexed to Marx Aff. at Ex. H.); *see also* Banco Central Communication "A" 272 (additional details regarding relevant procedures when the lenders and borrowers decide to maintain a direct relationship).

**4.** In light of the Court's conclusion that the defendants are subject to the "commercial activity" provision of the FSIA, the Court need not consider plaintiffs' argument that the defendants have waived sovereign immunity, either explicitly or implicitly.

nection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). In order to determine whether an action fits within this exception, the Court must consider (a) whether the action was "commercial" and (b) whether the action had a sufficient statutory nexus with the United States. *See Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1107 (5th Cir.1985); *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 308 (2d Cir.1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982).

Commercial activity is defined in the FSIA as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d); *see Texas Trading, supra*, 647 F.2d at 308–10. The FSIA further provides that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d); *see also* H.Rep. No. 1487, 94th Cong., 2d Sess. at 16, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6604, 6615 ("House Report"). In applying this test, courts have focused upon whether the activity in question is one in which private parties could ordinarily engage or whether it is limited to sovereigns. *See, e.g., Rush–Presbyterian–St. Luke's Medical Ctr. v. Hellenic Republic*, 877 F.2d 574, 578 & n. 4 (7th Cir.) *cert.*

*denied,* — U.S. —, 110 S.Ct. 333, 107 L.Ed.2d 322 (1989); *Letelier, supra,* 748 F.2d at 797; *Texas Trading, supra,* 647 F.2d at 309–10; *Braka v. Bancomer, S.A.,* 589 F.Supp. 1465, 1469 (S.D.N.Y.1984), *aff'd on other grounds,* 762 F.2d 222 (2d Cir.1985).

▪ The transactions at issue here fall squarely within the parameters of what private commercial entities do and have the capacity to do. In permitting creditors to substitute Banco Central's obligation to pay them in dollars for that of the original debtors in exchange for a 0.1% commission, Banco Central was performing a quintessentially commercial act. This is especially true since the existence of a profit motive, although not dispositive, is a factor the Court may properly consider in deciding what is a commercial as opposed to a sovereign act.[5] Furthermore, the creditors were not forced to accept Banco Central as a substitute obligor, but were free to maintain their prior relationship with the debtor.[6]

Indeed, the only serious argument that can be made in support of the claim that sovereign activity is at issue here is the assertion that the Bonods were issued as a consequence of Argentina's financial crisis and for the purpose of implementing Argentina's currency control regulations. However, that claim is refuted by the plain language of the FSIA itself, which as noted above, requires that the Court look to the nature of the act, and not its purpose.[7]

---

**5.** The Court does not read the Second Circuit's decision in *Letelier, supra,* as imposing a requirement that a foreign sovereign have a profit motive in order for its activities to be considered commercial. Rather, that case stated only that a court may properly consider evidence of a profit motive in ascertaining whether the sovereign's activities are commercial. *See* 748 F.2d at 797; *see also Joseph v. Office of the Consulate General of Nigeria,* 830 F.2d 1018, 1024 (9th Cir.1987), *cert. denied,* 485 U.S. 905, 108 S.Ct. 1077, 99 L.Ed.2d 236 (1988); House Report, *supra,* at 16, 1984 U.S.Code Cong. & Admin.News at 6615 ("Certainly, if an activity is customarily carried on for profit, its commercial nature could readily be assumed.").

**6.** Insofar as the Currency Regulations which resulted in the issuance of the Bonods preclud-

ed payment by the original debtor in dollars and altered the schedule of payments set forth in the original contracts, the Government of Argentina may not have been engaged in commercial activity. However, this action is not for altering the terms of the original contract and thereby inducing this breach. Instead, plaintiffs are suing Banco Central for breaching the obligation it assumed for a fee in place of the obligation of the original debtors. This action therefore is not based upon any sovereign activity of the Government, even assuming that the acts referred to above were arguably sovereign in nature.

**7.** Defendants' reliance upon *DeSanchez v. Banco Central de Nicaragua,* 770 F.2d 1385 (5th Cir. 1985), is misplaced. That case held that because in post-revolutionary Nicaragua the Cen-

In sum, Banco Central's obligation to pay in dollars was in its nature a contractual understanding and did not become clothed with sovereign immunity merely because in assuming that contractual obligation the Bank was implementing a foreign currency control policy on behalf of the Ministry of the Economy, which was primarily responsible for fashioning and directing the monetary policies of the government of Argentina. *See* Organic Charter of the Central Bank of the Argentine Republic at Art. 3(b) (purpose of the Bank shall be "[t]o execute the exchange policy outlined by the Ministry of Economy with counsel from the Central Bank") (annexed to Marx Aff. as Ex. F); *id.* at Art. 4 ("The Bank's activity shall conform to the general directives in matters of financial, currency-exchange, monetary and economic policy that the National Government may issue through the Ministry of Economy"); *see also id.* at Art. 35 (requiring the Bank to advise and report to Ministry of Economy about monetary exchange); *id.* at Art. 38 (same).[8]

■ This case is therefore very similar to *Braka* and *Callejo, supra,* where sovereign immunity was denied in situations where banks breached an obligation to pay on certificates of deposit because they were mandated to do so by currency control regulations which they did not promulgate. The same result should and must obtain here. Although the issuance of currency control regulations may be sovereign activity, the implementation of that policy through the issuance of commercial paper is not. *See West v. Multibanco Comermex, S.A.,* 807 F.2d 820, 825 (9th Cir.), *cert. denied,* 482 U.S. 906, 107 S.Ct. 2483, 96

L.Ed.2d 375 (1987); *Callejo, supra,* 764 F.2d at 1109–10; *Braka, supra,* 589 F.Supp. at 1470. It follows that the issuance of the Bonods in this case was a commercial and not a sovereign act.

Having concluded that the Bank's activity in this instance was a commercial agreement to pay a sum of money, the Court must next consider whether that commercial activity had the requisite nexus with the United States. *See* 28 U.S.C. § 1605(a)(2). Since this action clearly does not involve either "commercial activity carried on in the United States" by the defendants or "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere," 28 U.S.C. § 1605(a)(2), the only issue to be resolved is whether defendants' commercial activity had a direct effect in the United States. *Id.*

■ The Second Circuit has held that nonpayment of a debt payable in the United States to a United States company constitutes a direct effect in the United States for purposes of the FSIA. *See Texas Trading,* 647 F.2d at 312; *accord Meadows v. Dominican Republic,* 817 F.2d 517, 523 (9th Cir.), *cert. denied,* 484 U.S. 976, 108 S.Ct. 486, 487, 98 L.Ed.2d 485 (1987). However, that Court has left open the question of whether the same conclusion should be reached with respect to the nonpayment of a debt payable in the United States to a foreign plaintiff. *See Texas Trading, supra,* 647 F.2d at 312; *International Housing Ltd. v. Rafidain Bank Iraq,* 893 F.2d 8, 11 n. 3 (2d Cir.1989). While it is true that with respect to a foreign plaintiff the injury may be felt elsewhere as well, *i.e.* at

tral Bank had overall responsibility for the control and management of Nicaragua's monetary reserves the bank's decision to stop payment on a check issued by the bank when it was controlled by the former regime to the wife of the former Minister of Defense was a sovereign act. *See* 770 F.2d at 1393–94. That case turned upon the fact that the defendant bank was responsible for control of Nicaragua's foreign exchange. *See id.* Further, the court noted that the bank had earned no fee from the check. *See id.* at 1393. Neither situation is present here because the Ministry of the Economy in Argentina, not Banco Central, was ultimately responsible for fiscal policy and Banco Central did earn a com-

mission. *See also Rush–Presbyterian, supra,* 877 F.2d at 578–79 n. 5 (limiting *DeSanchez* to the "extraordinary circumstances" before the court in that case); *Chisholm & Co. v. Bank of Jamaica,* 643 F.Supp. 1393, 1400 n. 5 (S.D.Fla.1986) (same).

8. This is further evidenced by the circumstance that Banco Central refused to pay on the Bonods because it was directed not to by the Ministry of the Economy, not because of a policy decision by the Bank itself. *See* Decree No. 772 of May 23, 1986 (annexed to Marx Aff. as Ex. I); Resolution of Ministry of Economy of May 23, 1986 (annexed to Marx Aff. as Ex. J).

the domicile of the plaintiff, that circumstance does not alter the fact that the act of nonpayment which causes that injury occurs in both instances in the United States. It follows that in either case there is a direct effect within the United States sufficient to meet the requirements of the FSIA. *Accord L'Europeenne de Banque v. La Republica de Venezuela,* 700 F.Supp. 114, 121–22 (S.D.N.Y.1988); *see also Int'l Housing, supra,* 893 F.2d at 13 (Kaufman, J., dissenting) (noting trend among district courts to conclude that nonpayment of a debt to a foreign plaintiff in the United States constitutes a "direct effect").

Public policy considerations also lend support to this conclusion. The United States has a substantial interest in maintaining New York's status as an international financial center. *See L'Europeenne de Banque, supra,* 700 F.Supp. at 122 (citing *Allied Bank Int'l v. Banco Credito Agricola de Cartago,* 757 F.2d 516, 521–22 (2d Cir.), *cert. dismissed,* 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985)). This status will be enhanced by the result reached here because businesses will, as did plaintiffs here, choose to have payments made to them through New York's financial centers if they are confident that they can utilize American courts to protect their legal rights. This choice to accept payment in New York therefore "sufficiently implicates" the United States' interest in protecting people within its territories. *See L'Europeenne de Banque, supra,* 700 F.Supp. at 122.

### Personal Jurisdiction

■ Defendants also urge the Court to dismiss the complaint for lack of personal jurisdiction. However, the FSIA merges the concepts of personal and subject matter jurisdiction so that the Court has personal jurisdiction in any case in which the FSIA authorizes subject matter jurisdiction, so long as proper service is made, (which is not in dispute here), and so long as the requirements of due process are satisfied. *See* 28 U.S.C. § 1330(b); *Texas Trading, supra,* 647 F.2d at 308, 313; *Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivanos,* 712 F.Supp. 383, 390 (S.D. N.Y.1989). The exercise of personal jurisdiction is consistent with due process in any case where a defendant has sufficient contacts with the United States such that the exercise of jurisdiction would not offend " 'traditional notions of fair play and substantial justice.' "[9] *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)).

■ This test requires that the Court assess the defendants' contacts with the United States to determine: (1) the extent to which defendants availed themselves of American law; (2) the extent to which litigation in the United States was foreseeable to them; (3) the inconvenience to defendants of litigating in the United States; and (4) the countervailing interest of the United States in hearing the suit. *Texas Trading, supra,* 647 F.2d at 314; *see generally, Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414–16, 104 S.Ct. 1868, 1872–73, 80 L.Ed.2d 404 (1984); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297–98, 100 S.Ct. 559, 567–68, 62 L.Ed.2d 490 (1980); *Kulko v. California Superior Court,* 436 U.S. 84, 94, 98 S.Ct. 1690, 1698, 56 L.Ed.2d 132 (1978).

■ Thus, a defendant may be subject to personal jurisdiction, consistent with due process, both when the plaintiff's cause of action arises out of or is related to the defendant's contacts with the forum state and when it does not.[10] *See Helicopteros*

---

**9.** The personal jurisdiction analysis under the FSIA looks to the defendant's contacts with the entire United States, not just the relevant state or forum. *See Texas Trading, supra,* 647 F.2d at 314; *Walpex Trading, supra,* 712 F.Supp. at 390 n. 6; *Meadows v. Dominican Republic,* 628 F.Supp. 599, 606–07 (N.D.Cal.1986), *aff'd,* 817

F.2d 517 (9th Cir.), *cert. denied,* 484 U.S. 976, 108 S.Ct. 486, 98 L.Ed.2d 485 (1987).

**10.** Defendants' argument that the FSIA permits personal jurisdiciton only in those cases in which a plaintiff's action is related to a defendant's contacts with the United States is unsupported by both the language of the FSIA and its

*Nacionales, supra,* 466 U.S. at 414, 104 S.Ct. at 1872. However, in the latter case, more substantial contacts with the forum are necessary to support the exercise of personal jurisdiction. *See Walpex Trading, supra,* 712 F.Supp. at 390.

No serious claim can be made here that plaintiffs have failed to allege contacts of the defendants with the United States that would justify the exercise of personal jurisdiction over them. These include the following: (1) Banco Central's promise to pay plaintiffs in New York; (2) the Argentine government's maintenance of consulates throughout the country; (3) Banco Central's commercial activities in the United States; and (4) both defendants' maintenance of bank accounts in the United States. *See* Complaint at ¶¶ 8–9; Affidavit of Richard Cutler at ¶ 5 & Exs. E & F (sworn to May 29, 1990).[11]

This is especially true since the maintenance of bank accounts in the United States, protected by American laws governing the banking and insurance industries, has been held to indicate that a defendant has availed itself of American laws. *See Texas Trading, supra,* 647 F.2d at 314; *Hatzlachh Supply Inc. v. Savannah Bank of Nigeria,* 649 F.Supp. 688, 691 (S.D.N.Y. 1986). Furthermore, the circumstance that defendants agreed to pay the Bonods in United States dollars in an American Bank surely made an action for breach of that obligation in the United States foreseeable. *See Schmidt v. Polish People's Republic,* 579 F.Supp. 23, 28 (S.D.N.Y.), *aff'd,* 742 F.2d 67 (2d Cir.1984); *see also Hatzlachh, supra,* 649 F.Supp. at 691 ("where a defendant negotiates or obtains the services of a plaintiff through the use of United States

mail and phone system and *agrees to pay in the United States,* litigation in the United States has been held to be foreseeable.") (emphasis added). Moreover, defendants' maintenance of a consulate and commercial offices in New York indicates that the defendants transact business here with some regularity.

### *Forum Non Conveniens*

Finally, defendants assert that the Court should dismiss the action pursuant to the doctrine of *forum non conveniens.* That doctrine, which allows a district court to dismiss an action because other public and private interests outweigh the ordinary deference given to a plaintiff's choice of forum, is fully applicable to an action governed by the FSIA. *See Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 490 n. 15, 103 S.Ct. 1962, 1970 n. 15, 76 L.Ed.2d 81 (1983); *Crimson Semiconductor, supra,* 629 F.Supp. at 908. The private interests central to a *forum non conveniens* determination are the ease of access to proof and the availability of witnesses, *i.e.,* the ability to compel the presence of unwilling witnesses or the costs of transporting willing witnesses to the United States for trial. *See Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947). The public interests include the administrative burden on the Court, the burden that jury duty imposes upon the community when the action has no relationship to the community and the concerns raised by the possible need to apply foreign law. *See id.* at 508–09, 67 S.Ct. at 843; *Borden, Inc. v. Meiji Milk*

---

legislative history. Indeed, acceptance of that argument would render the "direct effect" provision of 28 U.S.C. § 1605(a)(2) superflous because that section necessarily contemplates the exercise of jurisdiction in situations where all of the contacts relevant to the cause of action occur outside the United States. *See Walpex Trading, supra,* 712 F.Supp. at 390–91; *Meadows, supra,* 628 F.Supp. at 605–06. Moreover, courts in FSIA cases have considered contacts that are both related and unrelated to the plaintiff's cause of action. This is, of course, consistent with the FSIA, which permits the exercise of jurisdiction to the maximum extent permitted

by due process. *See, e.g., Texas Trading, supra,* 647 F.2d at 314–15; *Walpex Trading, supra,* 712 F.Supp. at 391; *Crimson Semiconductor, Inc. v. Electronum,* 629 F.Supp. 903, 907–08 (S.D.N.Y. 1986). *But see Exchange Nat'l Bank v. Empresa Minera del Centro del Peru, S.A.,* 595 F.Supp. 502, 505 (S.D.N.Y.1984).

**11.** Because there has been no jurisdictional discovery in this action, plaintiffs need only allege in good faith legally sufficient allegations of jurisdiction. *See Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.1990).

*Prods. Co.,* 919 F.2d 822, 827–28 (2d Cir. 1990).

An essential determination for a *forum non conveniens* inquiry is whether there is an adequate alternative forum to resolve the dispute. *See Borden, supra,* 919 F.2d at 828–29; *Hatzlachh, supra,* 649 F.Supp. at 692; *Crimson Semiconductor, supra,* 629 F.Supp. at 908. Defendants in this case have not even asserted which particular forum they would relegate plaintiffs to, although it would obviously be the courts of Argentina. However, defendants have put forth no affidavits which would permit the court to conclude that Argentina is an appropriate forum. For example, there is no information in the present record which would allow the court to assess whether plaintiffs can even sue the Republic of Argentina in an Argentine court; whether plaintiffs would be able to enforce a judgment and receive American dollars in satisfaction of such a judgment; whether the action would be barred by the statute of limitations; or whether plaintiffs would have the ability to compel the testimony of witnesses. Accordingly, the court concludes that defendants have failed to show that Argentina provides an adequate alternative forum for this action. *See Hatzlachh, supra,* 649 F.Supp. at 692; *Crimson Semiconductor, supra,* 629 F.Supp. at 908–09.

Moreover, even if Argentina was a suitable alternative forum, the private interest factors listed in *Gulf Oil, supra,* do not support the conclusion that Argentina is a more appropriate forum for resolution of this dispute than this Court. Defendants have not provided the Court with a list of witnesses they would call at trial and their residence, which has been held to be a prerequisite for *forum non conveniens* dismissal. *See Hatzlachh, supra,* 649 F.Supp. at 692; *Ocean Shelf Trading Inc. v. Flota Mercante Grancolombiana S.A.,* 638 F.Supp. 249, 251 n. 4 (S.D.N.Y.1986). In the absence of such information, the Court cannot assess how defendants will be prejudiced by litigation in New York. In any event, this action centers upon defendants' obligations under the Bonods and therefore the factual issues will be largely supported by documentary proof. That circumstance also renders defendants' claim of prejudice doubtful.

Finally, the Court notes that the public interest factors also militate against dismissal under *forum non conveniens.* The need to apply Argentine law, if the Court must do so, is not itself a justification for dismissal under *forum non conveniens.* *See Manu Int'l, S.A. v. Avon Prods., Inc.,* 641 F.2d 62, 67 (2d Cir.1981). Moreover, since this is a non-jury trial case, *see* 28 U.S.C. § 1330(a); *see also* 28 U.S.C. § 1441(d), a local jury will not be burdened in resolving the dispute.

## CONCLUSION

For the reasons set forth above, defendants Republic of Argentina and Banco Central de la Republica Argentina's motions to dismiss shall be and hereby are denied in all respects.

It is SO ORDERED.