Juanita Gonzalez GARCIA,
Plaintiff-Appellee,

v.

The CHASE MANHATTAN BANK, N.A.
and Siro Perez Oliva, Defendants,

The Chase Manhattan Bank, N.A.,
Defendant-Appellant,

Siro Perez Oliva, Third Party
Plaintiff-Appellee,

Jose M. Perez Gonzalez, Third Party
Defendant-Appellee.

No. 296, Docket 83–7530.

United States Court of Appeals,
Second Circuit.

Argued Dec. 14, 1983.

Decided March 28, 1984.

As Amended June 20, 1984.

Andrew J. Connick, New York City (Mark N. Parry, Milbank, Tweed, Hadley & McCloy, New York City, of counsel), for defendant-appellant.

Guy L. Heinemann, New York City, Edelmiro Salas Garcia, Hato Rey, P.R., of counsel, for plaintiff-appellee Garcia and third party defendant-appellee Gonzalez.

Marcelo Curi, Flushing, N.Y., for third party defendant-appellee Oliva.

John L. Warden, H. Rodgin Cohen, Michael Straus, Maria Foscarinis, Sullivan & Cromwell, New York City, for amicus curiae The New York Clearing House Ass'n.

Gerald D. Roth, Irving Margolies, Peter P. Kenny, Lipkowitz & Plaut, New York City, for amicus curiae Esther Garcia Manas Perez, Administratrix of the Estate of Rosa Maria Manas Y Pineiro, Deceased.

Before MESKILL, KEARSE and CARDAMONE, Circuit Judges.

MESKILL, Circuit Judge:

Defendant Chase Manhattan Bank, N.A. (Chase) appeals from a judgment of the United States District Court for the Southern District of New York, Broderick, J., entered after a jury trial, awarding plaintiff Juanita Gonzalez Garcia $760,383.30 as the amount due on two certificates of deposit issued by Chase's Vedado, Cuba branch prior to Cuban government seizure of the branch's assets. We affirm.

## BACKGROUND

Garcia and her late husband Jose Lorenzo Perez Dominguez, a wealthy businessman, were Cuban citizens prior to the Cuban revolution. Dominguez also served in the Cuban Senate from 1954–1958 and retired from the Cuban army with the rank of colonel in 1949. Dominguez and Garcia became concerned for the safety of their money in 1958 in light of the ongoing Cuban revolution. At the recommendation of a friend, they visited Chase's Vedado branch on March 10, 1958 and spoke to two bank officers. Dominguez expressed his fears over the safety of his money and stated that he wanted to make a fixed term deposit of 100,000 pesos. The Chase officials responded that he was doing the right thing "because it was an insurance, security for the money." They explained that the deposit was a "private contract" between the bank and Dominguez and Garcia. They stated that Chase's main office in New York would guarantee the certificate and that they could be repaid by presenting the certificate at any Chase branch worldwide. The officials said that repayment could be made in dollars in New York since "that is the money that the bank used." Pesos were equal in value to dollars at the time.

Dominguez and Garcia gave Chase 100,000 pesos that day and received a non-negotiable certificate of deposit (CD) which by its terms was returnable on March 10, 1959 and bore an interest rate of three and one-half percent.

As the political situation in Cuba worsened during 1958, Dominguez and Garcia became increasingly worried about the safety of their money. They returned to the Vedado branch on September 16, 1958 and spoke with two Chase officers, one of whom was present during the March 10 discussion. The Chase officials again told them that they were doing the right thing by securing their money. The officers reaffirmed that payment could be had in dollars at any Chase branch. Dominguez and Garcia gave Chase 400,000 pesos this time. The CD they received would mature on March 16, 1959 and was otherwise identical to the first CD except that it bore an interest rate of three percent and was for six months rather than a year.

In late 1958 Dominguez and Garcia sent the CDs to Garcia's cousin in Spain for safekeeping. Her cousin promptly acknowledged receipt of the CDs.

When Fidel Castro entered Havana on January 1, 1959, Dominguez took refuge in the El Salvadorian Embassy and subsequently went to El Salvador. Garcia left Cuba for Spain in 1964. Dominguez died in Puerto Rico in 1975. The CDs were found after his death in his safe deposit box in a Chase branch in Puerto Rico.

In February 1959 the revolutionary Cuban government enacted Law No. 78 [1]

which enabled the Ministry of Recovery of Misappropriated Property, *inter alia*, to freeze bank accounts. The Ministry subsequently ordered Chase to freeze the Garcia/Dominguez "account." On July 16, 1959, the Ministry ordered the "account" closed and demanded that Chase remit its value. Chase complied by sending a sum equal to the debts owed Garcia and Dominguez to the Ministry.

Chase's Cuban branches were nationalized in 1960. The National Bank of Cuba assumed the assets and liabilities of Chase's Cuban branches.

In 1964 Dominguez inquired of Chase through Banco Coca in Madrid, Spain on the status of the CDs. He was advised by Chase of the actions of the Cuban government and told to address further inquiries to the National Bank of Cuba. Garcia made a similar inquiry in 1968 through Banco Coca. Chase's response was not introduced into evidence. In 1970, a lawyer for Dominguez wrote to Chase concerning the CDs. In response, Chase referred to its 1964 letter concerning Dominguez's original inquiry and noted again the actions of the Cuban government.

Garcia commenced the present action in 1976 in the United States District Court for the District of Puerto Rico seeking the

---

1. Cuban Law No. 78 provided in pertinent part (translated from Spanish):

CHAPTER I

The Ministry and Its Jurisdiction

Article 1. The Ministry of Recovery of Misappropriated Property is the proper organization of the Executive Power intended to recover property of any type which has been removed from the National Wealth and obtain the complete restoration of the proceeds of unjust enrichments obtained under the cover of the Public Power and to the detriment of said wealth.

For the purposes of the provisions of the preceding paragraph, the National Wealth is understood to be formed by the Wealth of the State, of the Provinces, of the Municipalities, of the Autonomous and Parastatal Organizations, and of the Savings Banks and Social Insurance.

Article 2. For the purposes of the Present Law, the right of action of the Ministry covers:

a) Public officials and servants and officials and employees of autonomous corporations and bodies, and those set forth in Article 154 of the Organic Law of the Court of Accounts.

b) Private natural or juridical persons who in any way have intervened in the matters forming the object of investigation and whose conduct has resulted in damage to the national wealth and enrichment for the benefit of said persons obtained under the coverage of the Public Power.

c) Natural or juridical persons who, as a result of the investigations carried out, are shown to appear fraudulently as owners of property and holders of rights which actually belong to the person who is the object of the proceedings and in such case the action for return governed by the present Law can be brought against such persons.

. . . .

Article 5. The Minister shall decree the precautionary measures which may be necessary in order to assure the purpose pursued by this Law, and particularly the following: ·

a) The freezing of bank accounts, the sealing and opening of safe deposit boxes in banks or in other private institutions.

money allegedly due on the certificates of deposit. The suit was transferred to the United States District Court for the Southern District of New York pursuant to 12 U.S.C. § 94 (1976; amended 1982).

## DISCUSSION

■ As a preliminary matter, we reject Chase's contention that Garcia's claim is barred by the New York statute of limitations.[2] An action for breach of contract must be brought within six years of the accrual of the cause of action. N.Y.Civ. Prac.Law § 213 (McKinney 1972). The cause of action on a certificate of deposit accrues upon demand, N.Y. U.C.C. § 3–122(2) (McKinney 1964). Demand occurs upon presentment and refusal to pay. *Id.;* N.Y. U.C.C. § 3–504 (McKinney 1964). Garcia's formal demand in this case occurred with the filing of her complaint.

Chase argues that a demand is unnecessary to start the statute of limitations running where there is a repudiation of the obligation prior to the demand. We need not decide whether a clear and unequivocal repudiation of the debt obligation would commence the limitations period, *see Tillman v. Guaranty Trust Co.*, 253 N.Y. 295, 297, 171 N.E. 61 (1930) (per curiam), because we agree with the court below that no such repudiation occurred in this case.

■ Whether Chase repudiated its obligations is a question of fact unless it can be said that as a matter of law a repudiation has occurred. Chase failed to submit the factual question of repudiation to the jury. The jury rendered a verdict favorable to Garcia; Chase is thus precluded from raising the factual issue on appeal. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 278–79 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). Chase argues, however, that Judge Broderick erred by not finding as a matter of law that it had repudiated its obligations on the CDs.

■ Chase maintains that the events of 1959 and 1960 and its communication of those facts to Garcia and Dominguez by letters in 1964 and 1968 constituted a clear and unequivocal repudiation. We disagree. Repudiation must be clear and unequivocal to constitute an anticipatory breach of contract. *Gittlitz v. Lewis*, 28 Misc.2d 712, 713, 212 N.Y.S.2d 219 (N.Y.Sup.Ct.), *appeal dismissed,* 14 A.D.2d 783 (1961); 11 W. Jaeger, Williston on Contracts § 1322 (3d ed. 1968). Chase's 1964 letter did not unequivocally indicate that it would not honor its obligations.[3] The letter merely recounted the actions of the Cuban government and referred inquiries to the National Bank of Cuba. Chase did not definitely

**2.** Garcia advances a number of reasons why the Puerto Rican statute of limitations should be applied despite the transfer under former section 94. The point is moot, however, due to our conclusion that her action is not barred by the shorter New York statute of limitations.

We note that jurisdiction is not exclusively based on diversity of citizenship. However, since there is no applicable federal statute of limitations, it is appropriate to look to state law.

**3.** The text of the letter provided:

Dear Sirs:

This is further to our letter of November 19 regarding the deposit receipts issued by our former Vedado Branch in Havana, Cuba, covering fixed deposit number 1924 for Pesos 400,000 in the name of Jose Lorenzo Perez Dominguez y/o Juanita Gonzalez Garcia and fixed deposit number 1573 for Pesos 100,000 in the name of Juanita Gonzalez y Garcia y/o Jose Lorenzo y Perez Dominguez.

According to information in our files these deposits were frozen by the Cuban authorities sometime in the first half of 1959, subject to the instructions of the Ministry of Misappropriated Funds, and on July 16, 1959 that Ministry instructed our former Cuban branches to close all frozen accounts and remit the proceeds to it by means of a bank Manager's check to the order of the Ministry for the Recovery of Misappropriated Funds.

As you know, our former branches in Cuba were expropriated on September 16, 1960 by the Cuban authorities and our assets and liabilities were taken over by them. We would suggest, should you desire further information with respect to these deposits, and the deposit with the Trust Company of Cuba, also mentioned in your letter, that you address an inquiry to the Banco Nacional de Cuba, Havana, which is now the sole banking organization in Cuba.

Sincerely yours,
George F. Lang
Assistant Vice President

state that it would not pay the debt, although this could be inferred from the letter. *Cf. Tillman,* 253 N.Y. at 297, 171 N.E. 61. Chase's 1968 letter was not introduced into evidence. Presumably it was similar in substance to both the 1964 and 1970 letters.[4] As such, we cannot say as a matter of law that Chase clearly and unequivocally repudiated its contractual obligations to Dominguez and Garcia. Therefore, the statute of limitations did not begin to run until a demand was made. Chase's statute of limitations argument thus fails.

Chase seeks to avoid liability to Garcia on the basis of the Cuban government's actions. It argues that while the CDs could be repaid at any Chase branch worldwide, Cuba's closing of Garcia's "account" and its appropriation of Chase's funds in a sum equal to the amount of its debt to Dominguez and Garcia prior to their presentment of the CDs canceled the debt. It then asserts that we may not question the validity of the Cuban government's action under the act of state doctrine. Chase's arguments on both of these issues must fail.

Law No. 78 permitted the Ministry of Recovery of Misappropriated Property to freeze bank accounts. The Ministry subsequently ordered Dominguez's and Garcia's "account" closed and demanded from Chase a sum equal to the amount of the debt.

■ "It is difficult to see how the seizure of the assets of the [bank] would of itself change the rights of the [bank's creditors] to be paid at the places and in the currency stipulated." *Pan-American Life Insurance Co. v. Blanco,* 362 F.2d 167, 170 (5th Cir.1966). The monies paid over to the Cuban government did not come from funds specifically earmarked to Dominguez's and Garcia's "account." Rather, they came from Chase's general funds in the branch bank. Title to the deposits was vested in Chase, which became a debtor of Dominguez and Garcia. *See Kondo v. Kat-*

*zenbach,* 356 F.2d 351, 357 (D.C.Cir.1966), *rev'd on other grounds sub nom. Honda v. Clark,* 386 U.S. 484, 87 S.Ct. 1188, 18 L.Ed.2d 244 (1967); 5B Michie on Banks and Banking, § 318 at 302 (1983) (footnote omitted). Chase's debt to Dominguez and Garcia was not extinguished merely because it was forced to pay an equivalent sum of its own money to a third party. *See Russek v. Angulo,* 236 S.W. 131, 133–34 (Tex.Civ.App.1921) (monies confiscated by a revolutionary government belonged to the debtor bank and did not constitute a seizure of the depositor's credit).

■ Chase would not argue that its debt was extinguished if an armed gunman had entered its Vedado branch and demanded payment of a sum equal to the amount of its debt to Dominguez and Garcia. Yet in effect, this is what transpired. The Cuban government did nothing more than "enter" Chase's Vedado branch armed with Law No. 78 and demand depositors' money. Chase turned over funds without requiring the surrender of the CDs, without notice to the holder of the CDs and without a fight. As in the case of a bank robbery, the bank itself must bear the consequences. *See* 5B Michie on Banks and Banking, § 326a at 317–18 (1983) ("[A] bank cannot be compelled to pay a certificate of deposit issued by it, without the production and surrender of the certificate .... [U]pon its payment by the bank of issue the certificate should be surrendered for cancellation. A bank acts at its peril in paying a certificate without surrender thereof and endorsement ....") (footnotes omitted). Where, as here, the debtor-creditor relationship was created primarily to ensure the safety of the creditors' funds, a debtor's payment to a third party of a sum equal to that owed the creditors does not extinguish the original debt. Thus, the actions of the Cuban government did not accomplish the cancellation of Chase's obligation to ensure the safety of Garcia's funds.

---

**4.** Chase does not argue that its 1970 letter constituted a repudiation, most likely because Gar-

cia commenced her action within six years of the date of that letter.

■ With regard to its second argument, Chase is correct that under the act of state doctrine United States courts will not question the validity of the actions of foreign governments carried out within their own borders. The classic definition of the doctrine was stated in *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897):

> Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

*See also Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428, 84 S.Ct. 923, 940, 11 L.Ed.2d 804 (1964).

■ Thus, if the situs of Chase's debt to Garcia were in Cuba, the Cuban government could validly seize it.[5] But even if what occurred was a seizure of the debt and not merely payment of a sum equal to it, the facts in the instant case call for a result favoring Garcia. The purpose of the agreement between Chase and Dominguez and Garcia was to ensure that, no matter what happened in Cuba, including seizure of the debt, Chase would still have a contractual obligation to pay the depositors upon presentation of their CDs. Garcia and Dominguez selected Chase because of its international reputation. Chase was aware of their desire to safeguard their money and assured them that their funds were protected. Chase "accepted the risk that it would be liable elsewhere for obligations incurred by its branch." *Vishipco Line v. Chase Manhattan Bank, N.A.*, 660 F.2d 854, 863 (2d Cir.1981), *cert. denied*, 459 U.S. 976, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982). If the understanding was that the debt could be paid by turning over the amount of the debt to the Cuban government if it should win the race to the bank, it is apparent that the deposits would never have been made.[6]

---

5. "The situs of intangible property is about as intangible a concept as is known to the law." *Tabacalera Severiano Jorge, S.A. v. Standard Cigar Co.*, 392 F.2d 706, 714 (5th Cir.), *cert. denied*, 393 U.S. 924, 89 S.Ct. 255, 21 L.Ed.2d 260 (1968). The general rule is that the situs of a debt depends upon jurisdiction over the debtor. *Harris v. Balk*, 198 U.S. 215, 222, 25 S.Ct. 625, 626, 49 L.Ed. 1023 (1905). For act of state purposes, "a debt is not 'located' within a foreign state unless that state has the power to enforce or collect it." *Menendez v. Saks & Co.*, 485 F.2d 1355, 1364 (2d Cir.1973), *rev'd on other grounds sub nom. Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976). *See also Vishipco Line v. Chase Manhattan Bank, N.A.*, 660 F.2d 854, 862 (2d Cir.1981), *cert. denied*, 459 U.S. 976, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982); *United Bank Ltd. v. Cosmic International, Inc.*, 542 F.2d 868, 873 (2d Cir.1976). If the foreign state can enforce or collect the debt, the act of state doctrine will apply to seizure of the debt because the doctrine seeks to avoid challenging the completed acts of foreign governments. *See Standard Cigar*, 392 F.2d at 715. In other words, where a foreign government has both the parties and the *res* before it and alters their relationship thereto, our courts realize that there is little that they can do to change the legal relationship.

6. The dissenting opinion states that the jury decided specifically that the parties did not contemplate that Chase would guarantee the safety of its obligations to Garcia. We disagree. The fact that the jury gave a negative response to interrogatory 5, which asked if the parties "contemplate[d] in their agreements that such a payment might be made," does not indicate to us that the jury determined that the parties did not agree that Chase would ensure against expropriation by the Cuban government. Interrogatory 5 referenced interrogatory 4, which inquired whether "the Verdado [sic] branch of Chase Manhattan in 1959 paid over to the Cuban government a sum equal to the value of plaintiff's certificates of deposit?" *See* dissenting opinion at n. *. The jury's response to interrogatory 5 could have meant that the parties never contemplated that the Vedado branch would make such a payment in 1959. The jury also could have interpreted interrogatory 5 to inquire whether the parties agreed that such a payment *should* be made. In the absence of a specific and unambiguous finding by the jury on the question of whether Chase agreed to guarantee the safety of the obligation, it was not improper to resolve all inferences in favor of Garcia given the jury's determination as to liability. *See* interrogatories 7 and 8 (Q: "Do you find by a preponderance of the evidence that defendant is liable to plaintiff with respect to [the two CDs]?" A: "Yes.").

Today's decision is predicated on Chase's contractual undertaking to ensure the safety of Dominguez's and Garcia's money by agreeing to honor its obligations in dollars at any of its branches. Our decision is not inconsistent with the policy considerations underlying the act of state doctrine. "The major underpinning of the act of state doctrine is the policy of foreclosing court adjudications involving the legality of acts of foreign states on their own soil that might embarrass the Executive Branch of our Government in the conduct of our foreign relations." *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 697, 96 S.Ct. 1854, 1862, 48 L.Ed.2d 301 (1976) (plurality opinion) (citing *Sabbatino,* 376 U.S. at 427–28, 431–33, 84 S.Ct. at 941–42); *see also Banco Nacional de Cuba v. Farr,* 383 F.2d 166, 180 (2d Cir.1967), *cert. denied,* 390 U.S. 956, 88 S.Ct. 1038, 19 L.Ed.2d 1151 (1968). We are not challenging the validity of the Cuban government's actions here and Cuba has shown no interest in the outcome of this case. We are simply resolving a private dispute between an American bank and one of its depositors. The result we reach will have no international repercussions. Chase cannot use the act of state doctrine as a defense because the doctrine is not implicated. *See Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 316 n. 38 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982) ("Act of state analysis depends upon a careful case-by-case analysis of the extent to which the separation of powers concerns on which the doctrine is based are implicated by the action before the court.").

The judgment of the district court is affirmed.

KEARSE, Circuit Judge, dissenting:

With all due respect to the majority, I must dissent since I believe the act of state doctrine relieves defendant Chase Manhattan Bank, N.A. ("Chase"), of liability in this case. The majority correctly recognizes that that doctrine, *see Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 416, 84 S.Ct. 923, 934, 11 L.Ed.2d 804 (1964), precludes our questioning the validity of acts of the Republic of Cuba within its borders (Majority opinion, *ante* at 650), and that "if the situs of Chase's debt to Garcia were in Cuba, the Cuban government could validly seize it" (*id.*). However, it appears to me that the majority gives insufficient recognition to the facts that the debts in question were collectible in Cuba; that the contract was not intended to guarantee the safety of plaintiff's funds against seizure by the Cuban government; and that, independently of the Cuban government's subsequent seizure of Chase's own assets and liabilities, that government in fact seized the assets of the plaintiff that are at issue here.

The applicability of the act of state doctrine to the present case depends on the power of the Cuban government to enforce or collect these debts within Cuba. *See Menendez v. Saks & Co.,* 485 F.2d 1355, 1364 (2d Cir.1973), *rev'd on other grounds sub nom. Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976). A debt is an intangible asset that has no physical location. It has its situs, in the eyes of the law, wherever it can be collected. *Harris v. Balk,* 198 U.S. 215, 222–23, 25 S.Ct. 625, 626–27, 49 L.Ed. 1023 (1905). In general, the creditor may enforce or collect the debt wherever he can obtain jurisdiction over the debtor. *Id.* at 222–23, 225, 25 S.Ct. at 626–627. The parties may, however, reach agreement limiting the permissible places of collection, *id.* at 225, 25 S.Ct. at 627, and normally " [t]he situs of a bank's debt on a deposit is considered to be at the branch where the deposit is carried ...." *Vishipco Line v. Chase Manhattan Bank, N.A.,* 660 F.2d 854, 862 (2d Cir.1981) (quoting Heininger, *Liability of U.S. Banks for Deposits Placed in Their Foreign Branches,* 11 Law & Pol.Int'l Bus. 903, 975 (1979)), *cert. denied,* 459 U.S. 976, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982). This common limitation on the situs of a banking debt is likewise subject to variation by agreement of the parties; the parties may agree that the debt may be collected at other locations,

either instead of or in addition to the branch at which the deposit was made. Thus, although a debt is a single obligation, it may have many situses. Since, however, it *is* but a single obligation, once it is collected pursuant to a valid decree at any place where the creditor could have collected it, the debt is extinguished. *Harris v. Balk, supra,* 198 U.S. at 223, 226, 25 S.Ct. at 626, 628.

In the present case, when plaintiff Garcia and her husband (collectively "Garcia") made their deposits and acquired their certificates, they agreed with Chase that the debts could be collected on presentation of the certificates anywhere that Chase had a branch. Cuba was not excluded. The parties could have agreed that the debts could be collected only outside of Cuba; but they did not. The jury, in response to special interrogatories with respect to each deposit, found that "the parties agreed that payment would be made upon presentation and demand ... anywhere that Chase Manhattan had offices *including Cuba.*" (Special Interrogatories 1.b., 2.b.; emphasis added.) Accordingly, Garcia could have collected the debts in Cuba. Since the debt was collectible in Cuba, it had one of its situses there.

Chase operated its Cuban branch until September 1960, when the Cuban government seized its assets and assumed its liabilities. Prior to September 1960, the Garcia deposits were collectible in Cuba, since that was the agreement of the parties. In 1959, while the Chase Cuban branch was in operation, the Cuban government froze

Garcia's assets and then ordered Chase to deliver those assets to the Cuban government. Because Garcia could have collected those debts within Cuba, I see no valid path to a conclusion that the debts were not subject to collection within Cuba by the Cuban government.

The fact that the certificates of deposit had been sent out of Cuba is immaterial; such a certificate is merely evidence of the debt, not the debt itself. *See, e.g.,* 5B *Michie on Banks & Banking* § 313, at n. 276 (1973); 7A *Michie on Banks & Banking* § 180 (1973). Further, although presentation of the certificates would have been necessary in order for Garcia to collect the debt, we are not entitled, in light of the act of state doctrine, to question the Cuban government's implicit declaration that it need not present that evidence of the debt in order to seize it—any more than we would be entitled, for example, to rule that the Cuban government could not seize another citizen's savings account without presenting a passbook.

The majority states that the primary purpose of the parties' agreement was to require Chase to "ensure the safety of Garcia's funds." (Majority opinion, *ante* at 650.) The parties *could,* of course, have agreed that even if the Cuban government required Chase to pay it a sum equal to Garcia's account, Chase would still have a contractual obligation to pay Garcia. But the jury found that the parties did *not* contemplate that event in their agreement.[1] The majority does not set aside

---

**1.** The jury answered interrogatories 4 and 5 as follows:

[4] Has it been established by a preponderance of the evidence that the Verdado [sic] branch of Chase Manhattan in 1959 paid over to the Cuban government a sum of money equal to the value of plaintiff's certificates of deposit?

Yes   X
No   ____

[5] If the answer is yes, did the parties contemplate in their agreements that such a payment might be made?

Yes   ____
No   X

Having answered No. 5 in the negative, the jury did not reach question 6, which was:

[6] If the answer is yes, was it the intent of the parties that such a payment would satisfy all obligations of Chase Manhattan to plaintiff?

To the extent that the jury's answer to the specific question in interrogatory 5 conflicted with its affirmative answer to the general question "Do you find ... that defendant is liable to plaintiff ...," (Special Interrogatories 7, 8), the court should either have entered judgment in accordance with the specific findings in the answer to interrogatory 5 or have ordered reconsideration or a new trial. Fed.R.Civ.P. 49(b).

any of the jury findings on any principled basis. It simply ignores them and substitutes its own views.

Accepting (1) the jury's finding that the debts could be collected in Cuba, (2) the Cuban government's unchallengeable seizure of Garcia's assets in Cuba, (3) the jury's finding that the parties did not contemplate in their agreement that there might be such a seizure, and (4) the principle that a debt may validly be collected only once, I conclude that there is no basis for holding Chase to be an insurer and that the debts owed by Chase to Garcia ceased to exist upon their seizure by the Cuban government. I am not persuaded to take the contrary view by the majority's statement that "[t]he result we reach will have no international repercussions." (Majority opinion, *ante* at 651.) The majority's result may not have such consequences in this case, but since it has no foundation whatever in the facts found by the jury it creates precedent that may be used in future cases that could involve such repercussions. Further, "[i]t ought to be and it is the object of the courts to prevent the payment of any debt twice over. Thus, if [Chase] owing a debt to [Garcia], paid it over under a valid [decree], to [the Cuban government, Chase] certainly ought not to be compelled to pay it a second time ...." *Harris v. Balk, supra,* 198 U.S. at 226, 25 S.Ct. at 628.

I would reverse the judgment of the district court and direct that the complaint be dismissed.