**OPTOPICS LABORATORIES CORPORATION, a Delaware corporation, as Assignee of Ashford Laboratories, Inc., Plaintiff,**

v.

**SAVANNAH BANK OF NIGERIA, LTD., Defendant.**

No. 91 Civ. 0312 (LBS).

United States District Court, S.D. New York.

March 22, 1993.

Antheil & Nicholas, Doylestown, PA (Jeffrey H. Nicholas, of counsel), for plaintiff.

Kreindler & Kreindler (Paul S. Edelman, of counsel), and Atadika & Atadika (Michael R. Atadika, of counsel), New York City, for defendant.

## OPINION

SAND, District Judge.

This case is brought by Optopics Laboratories Corporation, a Delaware corporation, as assignee of Ashford Laboratories, Inc., against Savannah Bank of Nigeria, Ltd. for nonpayment on a letter of credit issued by defendant. Jurisdiction is found under 28 U.S.C. § 1330, which provides that district courts shall have original jurisdiction over non-jury civil actions against a foreign state, and also under the Foreign Sovereign Immunities Act. Currently before the Court are cross-motions for summary judgment. Because we find that no genuine issues of material fact are in dispute and that plaintiff is

entitled to payment on the Letter of Credit as a matter of law, plaintiff's motion for summary judgment is granted. Defendant's motion for summary judgment is denied.

### Factual Background

The material facts surrounding the transaction at issue in this lawsuit are undisputed. In October 1982, Ashford Laboratories, Inc. ("Ashford"), a New Jersey corporation, contracted to sell to a Nigerian importer, Mabson Pharmaceuticals, Ltd. ("Mabson"), cold capsules for $32,265. In order to effect payment, Mabson applied for an irrevocable letter of credit with defendant, a government owned bank, Savannah Bank of Nigeria (the "Bank"). On the reverse side of the Application are printed certain "General Terms & Conditions", including one which will be discussed in further detail below, which reads: "This Letter of Credit is subject to the usual terms and conditions operating in the center where the Credit be established." (Exh. A to Aff. of Jeffrey Nicholas, Sept. 24, 1992).

Subsequent to the submission of the Application to the Bank by Mabson, Bank America International ("Bank America") advised Ashford that a letter of credit known as L–82493 in the amount of $32,265, payable in New York, in United States dollars, had been established by the defendant in Ashford's favor. (Exh. A to Aff. of Frank Nicholas, Sept. 24, 1992). The Letter of Credit is a two-page document, and is dated November 1, 1982. (Exh. B to Aff. of Frank Nicholas, Sept. 24, 1992). The Letter of Credit provides that it is subject to the Uniform Customs and Practice for Documentary Credits, 1974 Revision, International Chamber of Commerce Publication No. 290 (the "UCP"). (Exh. C to Aff. of Frank Nicholas, Sept. 24, 1992).

After the Letter of Credit was established and in reliance thereon, Ashford shipped the pharmaceuticals to Mabson. Ashford presented conforming documents in strict compliance with the Letter of Credit on or about November 30, 1982. Each document specifically identified in the Letter of Credit was submitted by Ashford.

The Bank approved the Letter of Credit for payment on December 20, 1982. Both the Application and the Letter of Credit made clear that due to Nigeria's foreign exchange controls, a Form M would have to be filed by the importer, Mabson, through the defendant. A Form M is an application directed to the Central Bank to purchase foreign exchange. Defendant complied with this requirement on January 20, 1983, with the request that "the Foreign Currency should be paid to Bank of America, New York". The record suggests that Mabson also complied with related procedures regarding the Form M.

The Bank failed to pay on the Letter of Credit, claiming that it was unable to remit United States dollars to Bank America due to the failure of the Central Bank of Nigeria to provide foreign exchange. A June 8, 1983 cable from the Bank advised Bank America that it could negotiate the documents for the Letter of Credit but that Bank America would not be reimbursed by defendant until foreign exchange cover was made available. Similar cables were sent by defendant to Bank America on February 21, 1984, and January 15, 1985. Bank America, justifiably, has not negotiated the payment of the Letter of Credit. Significantly, the defendant has admitted that it would like to pay the Letter of Credit, and has offered to do so in Naira, the Nigerian currency. Plaintiff has rejected that offer.

Sometime subsequent to defendant's acceptance of the Letter of Credit, the Government of Nigeria engaged in a program to reschedule the payment of foreign debt, referred to as the "refinancing exercise". Defendant contends that as part of that refinancing exercise, Nigeria required, as a condition to payment on the Letter of Credit, that Ashford submit a claim form to Chase Manhattan Bank. Defendant further avers that at least as early as April 15, 1985, Ashford received a document entitled "The Central Bank of Nigeria—Circular dated 18th April, 1984", which gave notice that creditors must lodge claims with Chase Manhattan Bank to have debts paid by the Central Bank. Ashford never submitted any

such claim form. Defendant asserts that due to Ashford's failure to submit the required document, the conditions of the Letter of Credit were not strictly complied with and the Bank is not required to honor the Letter of Credit.

Two other sets of facts should be noted at this point. In a letter to Mabson dated October 5, 1990, defendant acknowledged receipt of payment from Mabson for the Letter of Credit, and stated that "[w]e have not been able to remit same to the exporters [i.e. Ashford] due to a non-provision of the required foreign exchange cover by the Central Bank of Nigeria." (Exh. H to Aff. of Frank Nicholas, August, 1992). This indicates both that refusal to release funds is not due to any withholding of the money by the bank's customer, and furthermore, that the reason for the refusal is non-provision of foreign exchange, as stated in the cables to Bank America, and not any failure on Ashford's part to strictly comply with the terms of the Letter of Credit.

Finally, we take note of the facts regarding the assignment of the proceeds of the Letter of Credit by Ashford to Optopics, the plaintiff in this action. Ashford assigned to the plaintiff the right to receive the proceeds payable under the Letter of Credit by a document executed in March, 1992, effective February 20, 1990, as part of a settlement of various disputes between Ashford and plaintiff. From 1983 until approximately March, 1992, Ashford and plaintiff were related parties under common control and ownership. This assignment is relevant to the defendant's argument that plaintiff lacks standing to pursue this claim.

### Discussion

■ Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate if the supporting evidence demonstrates that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. The Court does not resolve disputed issues of fact, but rather, resolving any ambiguities and drawing all reasonable inferences against the moving party, assesses whether genuine issues of material fact remain for the trier of fact. *See, e.g. Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

The Court heard oral argument on the defendant's motion for summary judgment on September 3, 1992. At that argument, and in the papers which defendant subsequently filed in opposition to plaintiff's later filed cross-motion for summary judgment, defendant appears to abandon certain of the arguments raised in its first moving papers. However, on the chance that defendant did not intend to concede these defenses, the most promising ones will be addressed.

### A. *Choice of Law/Standing:*

Defendant argues that Nigerian law should be applied to this action, and that under Nigerian law, the assignment of the proceeds of the letter of credit is invalid and plaintiff therefore lacks standing to sue.[1]

Defendant makes a number of different arguments concerning why Nigerian law should apply, but fails to convince the Court either that Nigerian law applies, or that there is actually a conflict between New York law and Nigerian law.

■ Defendant argues that because paragraph seven of the General Terms and Provisions on the Application for the Letter of Credit states that "[t]his Letter of Credit is subject to the usual terms and conditions operating in the center where the Credit be established," the law of Nigeria applies to the Letter of Credit. As will be discussed more fully below, even if this were the correct interpretation of that provision, it would apply only to the Application, which is the contract between Mabson and defendant. It has no impact at all on the contract at issue in this suit, which is the Letter of Credit between plaintiff's assignor and the defendant.

---

1. We address the choice of law question in regard to the standing defense, because defendant does not assert a conflict with regard to any other aspects of the law relating to letters of credit.

The Letter of Credit itself does not provide which law will apply, although it states that the Letter of Credit is subject to the UCP. On the issue of assignability of the proceeds of a letter of credit, Article 47 of the UCP provides that:

> The fact that a credit is not stated to be transferable shall not affect the beneficiary's rights to assign the proceeds of such credit in accordance with the provisions of the applicable law.

The UCP differentiates between transfer of a letter of credit, which would entail transferring the duty to deliver the documents to the bank, and merely assigning the *proceeds* of a letter of credit, without any concomitant obligation of performance. The assignment to plaintiff was clearly the latter, as defendant concedes that Ashford had already submitted all the documents expressly called for by the Letter of Credit, and the assignment took place some seven years afterwards.

■ In *Algemene Bank Nederland, N.V. v. Soysen Tarim Urunleri Dis Tiscaret Ve Sanayi*, 748 F.Supp. 177, 182 (S.D.N.Y.1990), a case interpreting the analogous provision in the 1983 revision of the UCP, the court ruled that the issuing bank did not have to "accept" an assignment of proceeds for such an assignment to be effective.[2] By extension, we find that under the UCP there is no need for prior notice to the issuing bank to effect an assignment of proceeds. This is logical, because an assignment of proceeds is merely an assignment of rights, and not of obligations; it should be irrelevant both to the issuing bank and to the purchaser who receives the proceeds, as long as the original beneficiary is still responsible for the delivery of the documents.

Returning to the choice of law question more generally, "New York has accepted a grouping of contacts approach which gives to the place having the most interest in the problems paramount control over the legal issues arising out of contracts." *In re Allstate Insurance Company*, 178 A.D.2d 899, 577 N.Y.S.2d 936, 938 (3d Dept.1991). In this case, Ashford, a United States corporation, contracted for United States dollars to be paid on a letter of credit in New York. In similar situations, courts in New York have ruled that New York has the greatest interest in the litigation, and that New York law applies.

The case most closely on point is *J. Zeevi and Sons, Ltd. v. Grindlays Bank (Uganda) Limited*, 37 N.Y.2d 220, 371 N.Y.S.2d 892, 333 N.E.2d 168, *cert. denied*, 423 U.S. 866, 96 S.Ct. 126, 46 L.Ed.2d 95 (1975). In that case, a letter of credit was issued by a Ugandan bank in favor of an Israeli company, to be paid in United States dollars at a bank in New York. After the letter of credit was established, the Bank of Uganda, acting under authority derived from a Ugandan exchange control regulation, notified the defendant bank that foreign exchange allocations in favor of Israeli companies should not be paid. The defendant then informed the New York bank not to negotiate the letter of credit.

A lawsuit followed, and the defendant argued that under Ugandan law, the complaint should be dismissed. The court ruled that the facts established that the cause of action arose in New York, and that furthermore, New York had the greatest interest in the outcome of the case and its law would apply. The court stated, at pp. 898–899, 333 N.E.2d at pp. 172–173:

> In this instance, New York was the locus of repudiation, whereas it should have been a site of payment. The provision respecting reimbursement in New York was an integral part of that for which the parties bargained, it was not a discrete obligation ... The value to those in commerce of having a place at a financial capital where funds can be obtained on a simple letter of credit, away from a relatively small bank in an undeveloped country of uncertain political stability, is obvious.

---

**2.** The court found further support for its holding in the language of the letter of credit, which provided that the bank "agrees with the drawers, endorsers and *bona fide holders of drafts* (emphasis supplied) drawn under and in compliance with the terms of this letter of credit that the same shall be duly honored upon presentation and delivery of the documents herein specified." Similarly, the Letter of Credit here explicitly refers to "bona fide holders."

Regarding the choice of law, the *Zeevi* court ruled:

New York has an overriding and paramount interest in the outcome of this litigation. It is a financial capital of the world, serving as an international clearinghouse and market place for a plethora of international transactions ... A vast amount of international letter of credit business is customarily handled by certain New York banks whose facilities and foreign connections are particularly adaptable to this field of operation. The parties, by listing United States dollars as the form of payment, impliedly accepted these facts and set up procedures to implement their trust in our policies. In order to maintain its preeminent financial position, it is important that the justified expectations of the parties to the contract be protected. Since New York has the greatest interest and is most intimately concerned with the outcome of this litigation, its laws should be accorded paramount control over the legal issues presented.

This reasoning was endorsed by the Second Circuit in *Bank of Cochin, Limited v. Manufacturers Hanover Trust Company,* 612 F.Supp. 1533 (S.D.N.Y.1985), *aff'd.,* 808 F.2d 209 (2d Cir.1986). In that case, the letter of credit issued by Bank of Cochin expressly provided that it was subject to the UCP, and it was to be paid in United States dollars from a New York bank. The court, noting that the letter of credit was silent as to governing law, rejected the contention that the law of India applied and, citing to *Zeevi,* held that New York law applied.

In the face of these New York cases, the defendant argues that a recent decision of the Ninth Circuit, *Chuidian v. Philippine National Bank, et al.,* 976 F.2d 561 (9th Cir.1992), should govern our decision on choice of law. Aside from the obvious fact that a decision of that circuit is not binding upon this Court, that case, and the New York cases it cites, deal with very different factual scenarios.

In *Chuidian,* the question was whether a letter of credit should be enforced where performance was illegal in the place of issuance, but legal in the designated place of payment. The case arose after the change of government in the Philippines, and the letter of credit was part of a settlement between the plaintiff and Ferdinand Marcos. The government of Corazon Aquino suspected that the settlement had been entered into by Marcos to pay off the plaintiff for not exposing illegal activity by Marcos. While an investigation was pending, the government prohibited the Philippine bank from approving the letter of credit, which was to have been paid in Los Angeles.

The *Chuidian* court was addressing a very different situation than the one before this Court: what law do you apply when performance is illegal in the place of performance. To answer that question, the Ninth Circuit had to determine where the place of performance was, and since most of the acts surrounding the letter of credit took place in the Philippines, the court found that to be the place of performance. Since the Philippine government's order made performance of the contract illegal, the Ninth Circuit did not enforce the letter of credit. Furthermore, although the court did not expressly say so, under the "greatest interest" test, the Philippines could certainly be found to have a very serious interest in the legality of that particular letter of credit under the circumstances.

This is simply not the situation here. Performance on this Letter of Credit is legal in both the place of issuance, Nigeria (as evidenced by defendant's willingness to pay on the Letter of Credit in Nigerian currency) and in the place of payment, New York. Although the Nigerian government seeks to enforce its exchange controls, there is no allegation of any illegality in the underlying transaction. Therefore, the "place of performance" analysis employed by the Ninth Circuit is not appropriate in this case.[3]

---

**3.** Similarly, in *RSB v. Bank of Baroda,* 15 B.R. 650 (S.D.N.Y.1981), we held that Indian law should be applied where an Indian court had ruled that the Letter of Credit should not be paid due to fraud in the procurement of the underlying sales contract. The choice of law analysis when a supervening illegality has occurred in the issuing country which prohibits enforcement of a letter of credit is simply different than where no such illegality has occurred.

With regard to the assignability of the Letter of Credit, the defendant has not convinced the Court that a conflict between the law of Nigeria and the law of New York exists. The defendant has cited no Nigerian caselaw[4], but merely asserts that "the Bank has a right to choose its obligee." This statement leads the Court to believe that defendant is confusing transfer of the Letter of Credit and assignment of the proceeds of the Letter of Credit. Defendant quotes Harfield, *Bank Credits and Acceptances,* 5th Ed. 1974, pp. 180–181, for the proposition that "the courts have pretty generally held that a letter of credit in favour of a specific beneficiary is non-assignable." Aside from the fact that Harfield is certainly not discussing Nigerian law, it is also clear that in that section of his treatise, Harfield is explaining *transfer,* and not true assignment. Referring to article 46 of the UCP, which covers transfer, Harfield discusses the fact that the purchaser and issuing bank must be satisfied that the new beneficiary will deliver the required documents. In an assignment of proceeds, the new beneficiary does not inherit that obligation.

For all the foregoing reasons, we find that New York law applies to the transaction. In so far as the letter of credit law of New York and Nigeria do not differ, this finding has little impact. As regards the assignability of the proceeds of a letter of credit, under New York law, the Court will enforce the provision of the UCP, *United Bank, Ltd. v. Cambridge Sporting Goods Corp.,* 41 N.Y.2d 254, 392 N.Y.S.2d 265, 269, 360 N.E.2d 943, 947 (1976). Under the UCP and the reasoning of *Algemene, supra,* the assignment was proper and plaintiff has standing.

### B. *Forum non conveniens:*

Defendant argues that the Southern District of New York is not a convenient forum for this litigation, relying mainly on the "private interest" ground that witnesses and documents are in Nigeria. However, the Court can find no justification for live witnesses as there is no dispute of fact as to which the credibility of testimony is at issue. Likewise, there are no further bank records which the Court can foresee as necessary to the resolution of this case.

It is significant that a very similar motion to dismiss on forum non conveniens grounds made by defendant was denied in *Hatzlachh Supply Inc. v. Savannah Bank of Nigeria,* 649 F.Supp. 688 (S.D.N.Y.1986). In *Hatzlachh,* Judge Tenney found that Nigeria was not an adequate alternative forum, because even if plaintiff were to win, due to Nigeria's strict currency controls, it would not be able to take its award out of Nigeria, even in Naira. Since this Court has found that New York law applies, the "public interest" factors do not weigh in favor of dismissal on forum non conveniens grounds either.

We find that the Southern District of New York is a convenient and proper forum for this litigation.

### C. *Act of State:*

Defendant argues that the Nigerian exchange controls are governmental policy, and that any adjudication by this Court would be an interference with a sovereign act of state. Although we find that the act of state doctrine is not implicated, it is a claim which is of the utmost seriousness and will be addressed fully.

The act of state doctrine recognizes both that the laws of nations as applied within their own borders are sovereign and should not be passed upon by our courts, and that the judiciary must be restrained from rendering decisions which will affect the United States' foreign policy, a sphere of power constitutionally assigned to the execu-

---

4. At page nine of its brief in support of its motion to dismiss/summary judgment, defendant cites what appears to be a 1947 decision of an English court, which defendant states is an explication of an English statute regarding assignment adopted by the "Old Western Nigeria" in 1959. Neither the case nor the statutes were provided to the Court, and we have no way of determining if any of this is relevant to this discussion. Because we have found that New York law applies, the question of the exact scope of Nigerian law on this subject can remain unanswered. However, we note that the lack of citation to any current Nigerian law on point indicates to the Court that, more likely than not, none exists.

tive and legislative branches. "The act of state doctrine declares that a United States court will not adjudicate a politically sensitive dispute which would require the court to judge the legality of the sovereign act of a foreign state." *International Ass'n of Machinists v. OPEC,* 649 F.2d 1354, 1358 (9th Cir.1981), *cert. denied,* 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982).

■■ A prerequisite for the application of the act of state doctrine is that the act in question is one which takes effect entirely within the boundaries of the sovereign nation. Where this is not the case, our courts will give extraterritorial effect to the law of another nation, based on comity, only where it does not conflict with the laws and policies of the United States.

Defendant ignores a number of Second Circuit cases which indicate the nature of the pertinent inquiry in determining whether the application of Nigeria's exchange control regulations to the Letter of Credit takes place entirely within the boundaries of Nigeria.

In *Allied Bank Int'l v. Banco Credito Agricola,* 757 F.2d 516 (2d Cir.1985), the plaintiff brought an action to recover on promissory notes issued by three Costa Rican banks wholly owned by the Government of Costa Rica, which were payable in United States dollars, in New York. The banks defaulted on the notes solely due to the Costa Rican government's suspending all external debt payments. The court explained that the primary concern in applying the act of state doctrine is whether "adjudication would embarrass or hinder the executive in the realm of foreign relations," and that the rule is to be applied flexibly on a case by case basis. 757 F.2d at 521.

The Second Circuit in *Allied* held that the applicability of the act of state doctrine depends on the situs of the debt, defined as the right to receive repayment from the banks in accordance with the loan agreements. The court viewed the Costa Rican government's actions in extinguishing plaintiff's right to receive payment as a "taking", and reasoned that if the taking occurred within the foreign sovereign's territory, then the act of state doctrine would prohibit the courts of this country from adjudicating the matter. The

court said that locating the debt "depends in large part on whether the purported taking can be said to have 'come to complete fruition within the dominion of the [foreign] government'". 757 F.2d at 521.

In applying that standard, the *Allied* court held that "Costa Rica could not wholly extinguish the Costa Rican banks' obligation to timely pay United States dollars to Allied in New York. Thus the situs of the debt was not Costa Rica." 757 F.2d at 521. The court proceeded to state that Costa Rica's

> interest in the contracts at issue is essentially limited to the extent to which it can unilaterally alter the payment terms. Costa Rica's potential jurisdiction over the debt is not sufficient to locate the debt there for the purposes of the act of state doctrine analysis.

757 F.2d at 522.

The *Allied* court further stated that "acts of foreign governments purporting to have extraterritorial effect ... should be recognized by the courts only if they are consistent with the law and policy of the United States." 757 F.2d at 522. Because the United States would not condone the Costa Rican government's attempt to change unilaterally the terms of the contracts, the court did not give effect to the Costa Rican directives.

Two other Second Circuit cases employ the same analysis and reach the same result. In *Braka v. Bancomber,* 762 F.2d 222 (2d Cir. 1985), a case decided after *Allied,* the plaintiffs, United States citizens, purchased peso and dollar certificates of deposits from a Mexican bank, with the principal and interest payable in Mexico. Subsequently, the Mexican government decreed that all domestic obligations would be paid in pesos and at a devalued exchange rate. Plaintiffs then filed suit in federal district court in New York. The court held that the situs of the debt was Mexico, since the Mexican decree could wholly extinguish the plaintiffs' rights within the dominion of the foreign government. The act of state doctrine therefore barred plaintiffs' recovery.

In *Garcia v. Chase Manhattan Bank, N.A.,* 735 F.2d 645 (2d Cir.1984), plaintiffs

sued over the proceeds of two certificates of deposit which were issued by Chase's Cuba branch prior to the time Cuba seized the assets of the bank. The CDs provided that they were redeemable at any Chase branch worldwide. The Court found that the situs of the debt was wherever it could be collected, and therefore the acts of the Cuban government could not wholly extinguish the plaintiffs' rights. The act of state doctrine was therefore inapplicable.

■ The application of *Allied, Braka,* and *Garcia* to the case before this Court is clear. The "taking" is plaintiff's right to receive the proceeds of the Letter of Credit in United States dollars at a bank in New York. The act of the Nigerian government in refusing to provide the foreign exchange to defendant is not enough to wholly extinguish the Nigerian bank's obligation to pay on the Letter of Credit in New York. Therefore, the situs of the debt is not Nigeria, and the act of state doctrine is not implicated. Furthermore, because the Nigerian government's attempt to unilaterally modify a private letter of credit contract is against the law and policy of the United States, this Court will not enforce the Nigerian policy extraterritorially.

■ In response to this caselaw, defendant appears to place reliance on last year's Supreme Court decision in *Republic of Argentina and Banco Central de la Republica Argentina v. Weltover, et al.,* —— U.S. ——, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992). That case however did not address the act of state doctrine at all, but instead dealt with the Foreign Sovereign Immunities Act ("FSIA"), the application of which has not been seriously challenged in this action. *Weltover* makes clear that the FSIA would not bar plaintiff here, as the acts of the defendant clearly fall within the commercial activity exception in the statute and have a direct effect in the United States.[5]

For the foregoing reasons, we find that the act of state doctrine is inapplicable and does not bar plaintiff's suit against the bank.

D. *Defendant's Obligations Under the Letter of Credit:*

■ Having addressed the defenses raised, we turn now to the law of letters of credit, to determine whether plaintiff's assignor fulfilled its duties under the contract and whether defendant is obligated to pay. We note at the outset that ruling in favor of plaintiff may result in an unenforceable judgment. This is not a matter we take lightly. However, where a party merits judgment as a matter of law, the fact that such judgment may be unenforceable does not diminish that party's right to obtain a judicial determination in its favor.

The Second Circuit recently described the basic function of a letter of credit in *Alaska Textile Co., Inc. v. Chase Manhattan Bank, N.A.,* 982 F.2d 813 (2d Cir.1992), and we quote the relevant language:

> In its classic form, the letter of credit is only one of three distinct relationships between three different parties: (1) the underlying contract for the purchase and sale of goods between the buyer ("account party") and the seller ("beneficiary"), with payment to be made through a letter of credit to be issued by the buyer's bank in favor of the seller; (2) the application agreement between the bank and the buyer, describing the terms the issuer must incorporate into the credit and establishing how the bank is to be reimbursed when it pays the seller under the letter of credit; and (3) the actual letter of credit which is the bank's irrevocable promise to pay the seller-beneficiary when the latter presents certain documents ... that conform with the terms of the credit. [Citations omitted.] The great utility of the letter of credit derives from the fact that these

---

5. In *Weltover*, the question of whether the Argentinean exchange controls were commercial or political was central to the case, because the petitioners had named the Republic of Argentina as a party and the Government had caused the subject bonds to be issued. In the case before this Court, plaintiff is suing only the bank, (ad-mittedly considered a "foreign state"), on a contract entered into entirely independently of any actions taken by the government of Nigeria to restrict foreign currency exchange. The governmental policy is therefore separate and apart from the obligations and rights of the parties under the Letter of Credit.

three relationships are utterly independent of one another.

982 F.2d at 815.

■ Applying this formulation to this case, the first contract was the one between Ashford and Mabson, whereby Ashford would sell the pharmaceuticals to Mabson for $32,265. The second contract was the Application for the Letter of Credit, between Mabson and the defendant. The third contract, the one which is the subject of this lawsuit, is the Letter of Credit itself between Ashford and the defendant. Each contract is entirely independent of the others, and each is subject only to the terms bargained for by the parties to that particular contract. "The letter of credit constitutes the sole contract of the bank with the seller and is completely independent of the other contracts." *Venizelos, S.A. v. Chase Manhattan Bank,* 425 F.2d 461, 465 (2d Cir.1970).

■ The second fundamental principle of letter of credit law is that the beneficiary must strictly comply with the terms of the letter of credit in order for the bank to incur an obligation to pay. *Venizelos,* 425 F.2d at 465. As the Second Circuit has framed the rule:

> The issuing bank ... takes on an absolute duty to pay the amount of the credit to the beneficiary, so long as the beneficiary complies with the terms of the letter. In order to protect the issuing or confirming bank, this absolute duty does not arise unless the terms of the letter have been complied with strictly.

*Beyene v. Irving Trust Company,* 762 F.2d 4, 6 (2d Cir.1985). These terms typically include the delivery of documents which indicate that the underlying sale and delivery of goods occurred. The corollary to the rule that a beneficiary must strictly comply with the terms of the Letter of Credit is the rule that all terms must be explicitly stated; that is, the beneficiary must be able to ascertain with certainty what his obligations are under the contract. *Banque Worms v. Banque Commerciale Privee,* 679 F.Supp. 1173 (S.D.N.Y.), *aff'd.,* 849 F.2d 787 (2d Cir.1988).

Courts have interpreted these rules very stringently. In the *Beyene* case, for example, the issuing bank was relieved of its obligation to pay because of a misspelling in the bill of lading of the name of the person to whom notice was to be given of the arrival of the goods. The beneficiary was held to have thereby failed to comply with the terms of the letter of credit.

Following logically from the forgoing is the rule that "the consent of all parties, particularly the beneficiary, is necessary in order to modify the original terms and conditions of the credit." *Zeevi, supra,* 371 N.Y.S.2d at 897, 333 N.E.2d at 172. If the bank were allowed to unilaterally change the conditions of payment, and thereby relieve itself of the absolute duty to pay on the letter of credit, the entire function of the letter of credit mechanism would be vitiated. Article 3(c) of the UCP expressly provides that an undertaking to pay on an irrevocable letter of credit "can neither be amended nor cancelled without the agreement of all parties thereto."

■ Having set out the applicable law, we turn to the facts of this case. In order for the defendant to be liable to the plaintiff, plaintiff's assignor, Ashford, must have strictly complied with all the terms explicitly set out in the Letter of Credit. Despite all its protestations, defendant cannot dispute that Ashford delivered all the required documents, and that defendant accepted the performance. Defendant applied to the Central Bank for foreign exchange to cover the Letter of Credit on January 20, 1983. Defendant cabled the bank in New York City several times, advising the bank to negotiate the Letter of Credit and that foreign exchange would be provided when made available from the Central Bank. For example, the February 21, 1984 cable states "We advise subject [Letter of Credit] already approved by our central bank ... and upon release of FX cover we shall remit funds."

Defendant now attempts to argue that Ashford did not strictly comply with the terms of the Letter of Credit because Ashford failed to file a claim form with Chase Manhattan Bank during the refinancing exercise. The filing of such a document was not required by the Letter of Credit, and we will not enforce a unilateral post-hoc amendment of the contract. Plaintiff's assignor

fully complied with the terms of the Letter of Credit as they were explicitly stated, and defendant has an absolute duty to pay the proceeds to the assignee.

Finally, as we stated earlier, the fact that plaintiff may have great difficulty, or be thwarted entirely, in collecting the judgment, does not lessen its right to receive one. As was the case in *Allied, supra,* the defendant's "inability to pay United States dollars relates only to the potential enforceability of the judgment; it does not determine whether judgment should enter." 757 F.2d at 522.

### E. *Mitigation of damages:*

Defendant argues that even if plaintiff were entitled to the proceeds, it had an obligation to mitigate the damages by filing the claim form and receiving whatever dollar amount in whatever time period the government of Nigeria would have provided. Having failed to do so, defendant argues, plaintiff is not entitled to recover at all. Although failure to mitigate damages is applicable in the U.C.C. context, *Lund v. Chemical Bank,* 797 F.Supp. 259, 271 (S.D.N.Y.1992), we do not find the concept to be relevant here.

■ As plaintiff correctly argues to the Court, its damages were fixed (with the exception of interest) at the time the defendant established the letter of credit. The plaintiff did nothing to incur those damages, and is not obligated to accept some lesser amount at some uncertain date in the future, which would most likely have been the result had plaintiff filed the claim form. Furthermore, defendant has suffered no additional burden (again, with the exception of interest) due to plaintiff's refusal to accept the terms of the refinancing exercise. Defendant has been fully reimbursed for the Letter of Credit by the original purchaser, Mabson, and has therefore had plaintiff's money for some ten years. Under these circumstances, we find that plaintiff had no duty to settle for a lesser remedy to redress an injury it in no way caused.

### F. *Interest:*

■ As discussed above, where the parties have provided that a letter of credit is subject to the UCP, New York courts have held that the UCP controls, *United Bank Ltd. v. Cambridge Sporting Goods Corp.,* 41 N.Y.2d 254, 392 N.Y.S.2d 265, 269, 360 N.E.2d 943, 947. However, where the UCP is silent or ambiguous, an analogous provision of the New York Uniform Commercial Code may utilized if consistent with the UCP. *Bank of Cochin, supra,* 612 F.Supp. at 1542.

■ The UCP is silent on the subject of payment of prejudgment interest, and therefore we will look to the analogous provision of New York's U.C.C. Section 5–115(1) of the U.C.C. provides that the beneficiary's measure of damages for wrongful dishonor is the same as a seller's damages upon a buyer's breach of contract, namely "the face amount of the draft or demand together with incidental damages ... and interest less any amount realized by resale or other use or disposition of the subject matter of the transaction." The Second Circuit affirmed the award of interest on a letter of credit from the date of breach in the *Banque Worms* case, *supra,* at 849 F.2d 787.

■ The proper rate of interest is the statutory rate of 9% set out in CPLR § 5004. In diversity cases, the federal courts look to the law of the forum state on the issue of prejudgment interest. *Feel the Heat, Inc. v. Centurion Agency, Inc.,* 622 F.Supp. 273, 274 (S.D.N.Y.1985). The Second Circuit has held that in a diversity action at law, which includes a case for breach of contract, "[u]nder New York law, courts must apply the statutory rate of interest." *Action S.A. v. Marc Rich & Co., Inc.,* 951 F.2d 504, 508 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1763, 118 L.Ed.2d 425 (1992).

We find that plaintiff is entitled to prejudgment interest at the statutory rate from the date of breach, which would be the date that the payment on the letter of credit was due to be made after presentation of the appropriate documentation and approval of the bank. The documents were submitted to Bank America on November 30, 1982. Plaintiff represents in paragraphs eleven through thirteen of its 3(g) statement that:

11. On December 20, 1982, defendant bank cleared the Letter of Credit for payment.

12. The Letter of Credit would have been paid on or about December 20, 1982 if the Central Bank of Nigeria had allocated foreign exchange to cover the transaction.

13. The only reason that the Letter of Credit was not paid on December 20, 1982 was due to the failure of the Central Bank of Nigeria to allocate foreign exchange for this transaction.

In response to the foregoing, defendant does not dispute that the Letter of Credit was approved for payment on December 20, 1982, but merely states the following:

11. Payment under the L/C was always subject to the provision of dollars by the Central Bank of Nigeria ("CBN").

12. The L/C would have been paid if dollars were provided by the CBN, but as to when paid is pure conjecture.

13. The L/C would have been paid if dollars were provided by the CBN, but as to when paid is pure conjecture.

Because the defendant has not disputed that the Letter of Credit was approved for payment on December 20, 1982, we find that this was the date of breach. Interest is to be computed from that date.

### Conclusion

For the reasons stated above, plaintiff's motion for summary judgment is granted. Defendant's motion for summary judgment is denied. The judgment is in the amount of $32,265, plus interest at the statutory rate of 9% from December 20, 1982.

SO ORDERED.